**John SHIELDS and Hunter Schuehle Plaintiffs**

**v.**

**Bruce BABBITT, Secretary, United States Department of the Interior, Jamie Rappaport Clark, Director, United States Fish and Wildlife Service, and the Sierra Club Defendants**

**No. 99CV40.**

United States District Court, W.D. Texas, Midland–Odessa Division.

July 12, 2000.

Richard Clayton Trotter, San Antonio, TX, Paul M. Terrill, Vincent L. Hazen, Hazen & Terrill, P.C., Austin, TX, Thomas W. Stack, Thomas W. Stack, J.D., Gilbert, AZ, Allan E. Parker, Jr., Texas Justice Foundation, San Antonio, TX, for John H. Shields. Michael D. Weiss, Lawson, Weiss & Danziger, Houston, TX, for Hunter Schuehle.

Robert Shaw–Meadow, U.S. Attorney's Office, San Antonio, TX, Paul Boudreaux, Department of Justice, Wildlife and Marine Resource Section, Benjamin Franklin Station, Washington, DC, for Bruce Babbitt, Jamie Rappaport Clark.

David O. Frederick, Frederick Law, Austin, TX, Stuart N. Henry, Henry & Levin, Austin, TX, Max Renea Hicks, Law Offices of Max Renea Hicks, Austin, TX, Kelly Haragan, Henry, Lowerre & Frederick, Austin, TX, for Sierra Club.

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

BUNTON, Senior District Judge.

**BEFORE THE COURT** are Plaintiff Hunter Schuehle's Motion for Summary Judgment[1] filed March 6, 2000, Federal Defendants' Motion for Summary Judgment filed February 23, 2000 and Defendant Sierra Club's Motion for Summary Judgment filed March 8, 2000 in the above referenced case. In this action, Plaintiff Hunter Schuehle seeks a declaration that the "take" provisions of the Endangered Species Act ("ESA"), 16 U.S.C. § 1538(a)(1)(B), as applied to the endangered and threatened species living at or immediately downstream of San Marcos and Comal Springs (the "Edwards species") is unconstitutional. Schuehle contends that Congress has no authority to regulate the Edwards species pursuant to the Commerce Clause, Article 1, section 8, clause 3 of the United States Constitution, because such regulation involves purely intrastate activity. Schuehle further claims that the Sierra Club's enforcement of the ESA's take provision through the ESA citizen suit provision is an unconstitutional delegation of authority to a private entity.

Federal Defendants Bruce Babbitt and Jamie Rappaport Clark and argue that the Edwards species do affect interstate commerce, that Plaintiff's claims are not ripe for adjudication because no legal action

---

1. Only Hunter Schuehle remains a plaintiff in this case. Plaintiff John H. Shields's claims were dismissed by a court order filed January 27, 1999.

has been instigated against him, and that until such time, Plaintiff has no standing to seek a court order to stop enforcement of the ESA. Defendant Sierra Club contends that the constitutionality of the ESA as applied to the Edwards species has already been established in other litigation, that the ESA may be constitutionally applied to the whole intrastate species within the reach of the interstate commerce clause and that the Edwards species both generate interstate commerce and themselves move in interstate commerce. The Sierra Club further maintains that Schuehle lacks standing to bring this suit either in his official capacity or his individual capacity and that his claim is not ripe. Finally, Sierra Club maintains that Schuehle has not demonstrated that he has been harmed by the Sierra Club's alleged threats of suit and that Schuehle's claim of improper delegation has no merit because only Congress, or possibly the Department of the Interior, has the authority to delegate rulemaking.

This Court held a hearing on the parties' respective motions on April 3, 2000. After due consideration of the pleadings and accompanying evidence, the Court is of the opinion that Federal Defendants' and Sierra Club's respective motions for summary judgment should be granted and Plaintiff's motion for summary judgment should be denied, for the reasons set forth below.

### Background

Congress' overriding goal in enacting the Endangered Species Act of 1973, 16 U.S.C.A. §§ 1531–1544, is to promote the protection and, ultimately, the recovery of endangered and threatened species. *Wyoming Farm Bureau Fed'n v. Babbitt,* 199 F.3d 1224, 1237 (10th Cir.2000) (citing H.R. Conf. Rep. No. 97–835, 97th Cong., 2d Sess. at 30 (1982), reprinted in 1982 U.S.C.C.A.N. 2860, 2871) ("In enacting the Endangered Species Act, Congress recognized that individual species should not be viewed in isolation, but must be viewed in terms of their relationship to the ecosystem of which they form a constituent element. Although the regulatory mechanisms of the Act focus on species that are formally listed as endangered or threatened, the purposes and policies of the Act are far broader than simply providing for the conservation of individual species or individual members of listed species.")); *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 184, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (noting that the plain intent of Congress in enacting the Endangered Species Act was to halt and reverse the trend toward species extinction, whatever the cost); *Catron County Bd. of Com'rs, New Mexico v. United States Fish and Wildlife Serv.,* 75 F.3d 1429, 1437 (10th Cir.1996) (identifying ESA's core purpose as prevention of the extinction of species by preserving and protecting the habitat upon which they depend from the intrusive activities of humans); *Village of Kaktovik v. Watt,* 689 F.2d 222, 233 (D.C.Cir.1982) (recognizing environmental protection as the sole objective of the Endangered Species Act).

■ One of the purposes of the Endangered Species Act is to enforce international agreements designed "to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction." *United States v. Bernal,* 90 F.3d 465, 467 (11th Cir.1996) (citing 16 U.S.C. § 1531(a)(4); *Tennessee Valley Auth.,* 437 U.S. at 184, 98 S.Ct. 2279).

The Secretaries of Commerce and the Interior jointly administer the ESA through the National Marine Fisheries Service and United States Fish and Wildlife Service ("USFWS"). The ESA instructs the Secretary of the Interior to promulgate by regulation a list of those species that are either endangered or threatened, and to define the critical habitat of these species. *See* 16 U.S.C. §§ 1533, 1536 (1985 & Supp.2000). Once a

species is listed and a critical habitat is designated, specific substantive and procedural protections are accorded to that species and its habitat. *See* 16 U.S.C. § 1536(a)(2) (1985).

The take provision, § 9(a)(1)(B) of the ESA, 16 U.S.C. § 1538(a)(1)(B) (1985), makes it unlawful for any person to "take" any listed species without a permit or authorization. The term "take" as defined in the ESA means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19) (1985). The ESA imposes substantial civil and criminal penalties, including imprisonment, for "any person" who knowingly "takes" an endangered or threatened species, in violation of § 9(a)(1)(B). 16 U.S.C. §§ 1540(a), (b) (1985 & Supp.2000) (authorizing civil fines of up to $25,000 per violation and criminal penalties of up to $50,000 and imprisonment for one year).

The fish, amphibian and plant species which are the subject of this litigation have been listed by the USFWS as "endangered" or "threatened" pursuant to the Endangered Species Act ("ESA"). These species include the fountain darter *(Etheostoma fonticola)*, the San Marcos salamander *(Eurycea nana)*, the San Marcos gambusia *(Gambusia georgi)*, the Texas blind salamander *(Typhomolge athbuni)*, the Comal Springs dryopid beetle *(Stygompamus comalensis)*, the Comal Springs riffle beetle *(Heterelmis comalensis)*,[2] and Texas wild-rice *(Zizania texana)*(collectively, "the Edwards species"). The Edwards species are located entirely within the state of Texas. The Edwards species are native to only one very small area in the South Central Texas region— at or just downstream of San Marcos and Comal Springs, the primary spring outlets for water in the Edwards aquifer.

The Edwards Aquifer is dependent on annual rainfall for recharge. During droughts, springflow from the Edwards Aquifer can become almost the sole source of flow downstream into the Guadalupe River. According to the Sierra Club and the USFWS, the natural flow of the San Marcos and Comal springs is vital to the continuing existence of the Edwards species. During dry periods, pumping from the Edwards Aquifer increases and flow from the Springs correspondingly decreases, sometimes to critical levels. This alters the aquatic habitat, causing "takes" of the Edwards species listed under the ESA, and reduces the flow of surface water downstream. Extremely low or nonexistent flow from the Springs places the Edwards species in "jeopardy."[3]

---

2. Plaintiff's First Amended Complaint for Declaratory Judgment identifies only the fountain darter, San Marcos salamander, San Marcos gambusia, the Texas blind salamander and Texas wild rice as Edwards species listed under the ESA. The Comal Springs dryopid beetle and the Comal Springs riffle beetle are also listed as endangered. 50 C.F.R. § 17.11 (2000). The Sierra Club states in its August 14, 1998 letter to the Edwards Aquifer authority that these two species are found at one or both of the spring ecosystems (Comal and San Marcos).

3. The ESA also contains a jeopardy provision, as follows:

Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee .... In fulfilling the requirements of this paragraph *each agency shall use the best scientific and commercial data available.*

16 U.S.C.A. § 1536(a)(2) (1985). The constitutionality of the jeopardy provision is not specifically challenged in this litigation.

Plaintiff Hunter Schuehle lives and raises livestock and exotics, such as zebra, Axis deer and Fallow deer, on the Parker Creek Ranch in Medina County, Texas south of the town of D'Hanis. Schuehle has lived in Medina County for 50 years, is a former county official and is currently serving as an elected member of the Board of Directors of the Edwards Aquifer Authority ("EAA"). Schuehle represents District 12, which comprises the western part of Medina County. Schuehle also serves as Treasurer for the EAA Board of Directors. The EAA, a political subdivision of the State of Texas, was established by the Texas Legislature in 1993 pursuant to the Edwards Aquifer Act.[4] The EAA is a regional regulatory authority that has jurisdiction over groundwater withdrawals from the Edwards aquifer. Although Schuehle serves in an official capacity with respect to the EAA, the EAA itself is not a plaintiff in this suit and Schuehle does not allege that he represents the EAA in any capacity in this litigation.

Schuehle owns several parcels of property on which Edwards aquifer wells are located: (1) the Cole Dairy in Bexar County; (2) the Wurzbach property in Medina County; and (3) the Frio River Ranch in Uvalde County. The Cole Dairy and Wurzbach properties have Edwards Aquifer wells that have been historically used for irrigated farming. The Edwards well on the Frio River Ranch is used for domestic and livestock purposes.

The Sierra Club sent two Notice of Intent to Sue letters dated April 12, 1990 and April 15, 1994 to individuals and entities (including federal agencies) withdrawing or diverting water from the Edwards aquifer ("the Edwards pumpers"), alleging that such actions constituted violations of the ESA.[5] In the April 12, 1990 letter, the Sierra Club stated that the cumulative impact of such actions threatens to destroy federally designated critical habitat and imperils the well being of certain endangered and threatened species. In the April 15, 1994 letter, the Sierra Club stated that the Edwards pumpers' actions and refusals to act cause severe overdrafting of the Edwards Underground River, and in turn "poses a substantial and imminent threat of jeopardy to the continued existence of endangered and threatened species and to the public health and safety of 1.5 million people." In both letters, the Sierra Club attributed alleged violations of section 9 of the ESA to the non-federal agency pumpers.[6] In the April 12, 1990 letter, the Sierra Club stated its intention

4. Act of May 30, 1993, 73rd Leg., R.S., ch. 626, § 1.06, 1993 Tex. Gen. Laws 2355, as amended by Act of May 29, 1995, 74th Leg., R.S., ch. 261, 1995 Tex. Sess. Law Serv. 2505 ("Edwards Aquifer Act").

5. The Sierra Club also sent a Notice of Intent to Sue dated August 14, 1998 letter to the Chairman, General Manager and Board Members of the Edwards Aquifer Authority, stating that the "springs, the quality of water in the Edwards Aquifer, and the threatened and endangered species dependent on spring flows from the Edwards are needlessly at risk and suffering harm because of excessive pumping caused by the EAA". Schuehle received the August 14, 1998 letter in his capacity as EAA Board Member. The EAA is not a plaintiff in this case, however, and the letter is not directed to Schuehle or any of the other Edwards pumpers in their individual capacities. Consequently, the August 14, 1998 is not relevant for purposes of this suit.

6. The April 15, 1994 letter states, "The Federal Violators, the [Texas Natural Resources Conservation Commission], and the City of San Antonio and other individuals and entities who withdraw water from the Edwards Aquifer ... have violated and are violating ESA § 9 by authorizing, funding or carrying out pumping, or by authorizing, funding or carrying out activities that allow, maintain, encourage or increase pumping, from the Edwards to an extent that reduces Edwards levels and Comal and San Marcos springflow rates to below the points at which endangered wildlife are actually killed or injured."

to file suit under the authority of section 12(g) of the ESA, 16 U.S.C. § 1540(g), if litigation were necessary, to correct such violations. In the April 15, 1994 letter, the Sierra Club stated that it planned to "take prompt legal action to obtain judicial remedies for this emergency."

The USFWS sent letters to the Edwards pumpers (including Schuehle) dated March 4, 1993 and April 28, 1993 regarding *Sierra Club v. Lujan*, No. MO–91–CA–069, 1993 WL 151353 (W.D.Tex. Feb.1, 1993). In *Sierra Club v. Lujan*, the plaintiffs contended that continued, unregulated pumping of water from the Edwards Aquifer harms various endangered species residing in and near the Comal Springs and San Marcos Springs. In that suit, this Court required the USFWS to determine the springflow requirements to avoid a taking or jeopardy of the listed species in both Springs. *Id.* at *33. The Court entered judgment and issued findings of interim minimum springflows, determined that certain endangered species were "taken" within the meaning of the ESA whenever springflows drop below a certain flow-rate as a result of withdrawals from the Edwards Aquifer,[7] and ordered the USFWS to provide all persons and entities withdrawing water from the Edwards with a copy of the Court's judgment. *Id.* at *34. In the March 4, 1993 letter, the USFWS encouraged Edwards pumpers to take necessary water conservation measures and to collectively work to provide a

system of groundwater management. The USFWS further noted that the Court found that excessive pumping of the Edwards Aquifer could result in contamination of the aquifer and could permanently and irreversibly ruin the aquifer. In its April 28, 1993 letter, USFWS identified springflow levels currently believed necessary to avoid a taking of listed species, and stated that "[a]ny withdrawal of water from the Edwards aquifer that would cause the springflow levels to drop below these identified levels could contribute to a taking of listed species in violation of the Endangered Species Act unless a [§ 10(a)] permit authorizing the 'take' has been obtained." In its June 25, 1993 letter, USFWS notified the Edwards pumpers of minimum springflow levels currently believed necessary to avoid jeopardy, destruction or adverse modification of critical habitat for the Edwards species and damage and destruction of Texas wild rice.

In 1996, Comal Springs Flow was as low as 83 cubic feet per second (cfs) during the month of August, and averaged below 100 cfs for the months of July and August. In 1998, Comal Springs Flow was as low as 168 cfs during the month of August, and averaged below 200 cfs for the month of July. William M. Seawell, Assistant Field Supervisor for USFWS Austin regional office, stated in his February 10, 2000 deposition that he was accurately quoted as stating the following:

---

7. U.S. Fish and Wildlife Service determination of minimum springflows in cubic feet per second (cfs) needed to prevent take, jeopardy, or adverse modification of critical habitat are as follows:

| Species | Take | Jeopardy | Adv. Mod. |
|---|---|---|---|
| Fountain darter (Comal) | 200 | 150 | N/A |
| Fountain darter (San Marcos) | 100 | 100 | 100 |
| San Marco gambusia | 100 | 100 | 100 |
| San Marcos salamander | 60 | 60 | 60 |
| Texas blind salamander (San Marcos) | 50 | 50 | N/A |
| | *Damage and Destruction* | | |
| Texas wild-rice | 100 | 100 | 100 |

San Marcos & Comal Springs & Associated Aquatic Ecosystems (Revised) Recovery Plan, U.S. Fish & Wildlife Service—1996, Table 2 at 17.

We're looking at possible enforcement options and hopefully gaining some co-operation from some of the pumpers to try to limit the speed at which the aquifer is being drawn down.

Law enforcement is always an option. We certainly don't want to pursue that option, but we're getting forced into a position where we may have to.

We're discussing the situation with law enforcement people and with our lawyers right now, and we'll take whatever action is appropriate.

Civil suits are possible, as well as criminal charges against major pumpers if any members of the [Edwards species] are found dead.

Affidavit of William M. Seawell at 64–66. Plaintiff Schuehle was aware that during the summers of 1996 and 1998, springflows at Comal Springs fell well below "take" levels for the fountain darter at Comal Springs. Under these conditions, according to the Sierra Club and USFWS' interpretation of the ESA, pumping from the Edwards Aquifer is a violation of § 9(a)(1)(B) of the ESA. Schuehle claims that because of the numerous threats of ESA prosecution for pumping groundwater from the Edwards aquifer and the ESA lawsuits involving the Edwards species, he reduced his irrigation pumping from the Edwards wells on the Cole Dairy and Wurzbach properties, then completely quit irrigating his farmland on the Cole Dairy and Wurzbach properties with Edwards water.

In *Sierra Club v. San Antonio*, No. MO–96–CA–97 (W.D.Tex.1996), a case currently pending before this Court, defendant Southwest Research Institute moved to dismiss arguing that the ESA as applied to the Edwards species is unconstitutional because the Edwards Aquifer and the Edwards species exist entirely within the state of Texas and the Commerce Clause only gives Congress the authority to regulate interstate activities. Also in that case, John Shields (a plaintiff who has been dismissed in the instant case) sought to intervene based, *inter alia*, on the fact that he uses water from the Edwards. Shields also sought to file a counterclaim alleging that the ESA, as applied to the Edwards and Edwards dependent endangered species, is unconstitutional because neither is connected to interstate commerce. The Court heard testimony as to the Edwards' species effect on interstate commerce in that case and set forth its reasoning in Orders filed on August 9, 1996 and August 21, 1996 as follows:

> At the August 1, 1996 hearing, the Court heard substantial evidence that the San Marcos and Comal Springs and the endangered species that inhabit them affect interstate commerce. David Whatley, former director of the City of New Braunfels Parks and Recreation Department testified that people come from out-of-state to observe the endangered species....
>
> Tom Brandt, Acting Director of the San Marcos Fish Hatchery and home to endangered Fountain Darters and Texas Blind Salamanders, testified that he gives tours to out-of-state scientists and other interested visitors of the hatchery. Clark Hubbs, Professor Emeritus of Zoology at the University of Texas at Austin, testified that the University conducts field trips to the San Marcos and Comal Springs so that visiting professors and students from outside the state of Texas, and in some cases, outside the United States, may observe the endangered species. Hubbs also testified that before the ESA was enacted, Fountain Darters were captured and sent to museums and aquariums around the world. Unlike *Palila*,[8] where the court held

8. *Palila v. Hawaii Dep't of Land and Natural Resources,* 471 F.Supp. 985, 995 (D.Haw. 1979).

that the commerce clause was satisfied by the possibility of interstate movement of species and persons, there is substantial evidence before this Court that people do travel in interstate commerce to view these endangered species.

Moreover, there are numerous agricultural pumpers taking water to irrigate their crops from the Edwards. It seems inconceivable to Court that all of the crops irrigated with Edwards water are consumed entirely within the boundaries of this state. For these reasons, the Court is of the opinion that the endangered species, as well as their habitat, substantially affect interstate commerce....

*Sierra Club v. San Antonio,* Order of Aug. 9, 1996, at 3–4 and Order of Aug. 21, 1996, at 5–6. In the instant case, the federal defendants attach the sworn testimony of David Whatley, Tom Brandt, and Clark Hubbs as summary judgment evidence. Additionally they attach a copy of an affidavit of Tiff E. Barton, legal assistant to Sierra Club's counsel, which was also submitted in *Sierra Club v. San Antonio.* Mr. Barton states that he personally visited Aquarena Springs in San Marcos, Texas on July 31, 1996 and observed the Endangered Species exhibit there, at which displays, photographs and brochures were available. Mr. Barton observed roadside billboard advertising the exhibit, observed several vehicles at Aquarena Springs with out-of-state and foreign license plates, and personally talked to visitors from Mexico who were there to see the exhibit. Also bolstering Sierra Club's argument that regulation of the Edwards species would have a substantial effect on interstate commerce, is the affidavit of economist M. Ray Perryman, introduced in *Sierra Club v. Lujan* as well. Perryman estimated that pumping restrictions could affect spending in Bexar County by as much as 9.5 billion dollars and also would result in the loss of

up to 135,000 permanent jobs in Bexar County.

The Sierra Club attached as summary judgment evidence copies of two U.S. Fish and Wildlife Service Endangered Species Permits issued by USFWS in Albuquerque, New Mexico for the Edwards species. The first permit, issued to Southwest Texas State University, authorizes the furnishing of live Texas blind salamanders to the San Marcos National Fish Hatchery and Technology Center in San Marcos, Texas, the Dallas Aquarium and the Cincinnati Zoo. The second permit, issued to the Columbia Environmental Research Center in Columbia, Missouri, authorizes scientific research to be conducted on fountain darters. The Sierra Club also submitted as evidence a letter and a Federal Fish and Wildlife Permit/Application by Dallas Zoo requesting to amend the Dallas Zoo/Dallas Aquarium existing fountain darter Endangered Species Permit by adding the Texas blind salamander and the Barton Springs salamander. The permit already in place allows fountain darters to be maintained and displayed at the Dallas Aquarium.

Schuehle, the federal defendants and the Sierra Club are in agreement that there are no genuine issues of material fact in this case. Schuehle challenges the take provision of the ESA, 16 U.S.C. § 1538(a)(1)(B), claiming it is unconstitutional as applied to the Edwards species. The central issue for determination by this Court is whether Congress has the authority to regulate the Edwards species, found exclusively within the borders of the state of Texas, pursuant to its power to regulate interstate commerce conferred by the Commerce Clause of the United States Constitution.

### *Standard of Review*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to

judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Guthrie v. Tifco Industries,* 941 F.2d 374 (5th Cir.1991). The moving party bears the initial burden of showing that there is no genuine issue for trial; it may do so by pointing out the absence of evidence supporting the nonmoving party's case. *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) citing *Latimer v. Smithkline & French Lab.,* 919 F.2d 301, 303 (5th Cir. 1990); *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The court may only grant the motion after drawing all inferences from the facts in favor of the party resisting the motion. *Boazman v. Economics Lab., Inc.,* 537 F.2d 210, 213–14 (5th Cir.1976); *Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir. 1990), *cert. denied,* 510 U.S. 859, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993).

Summary judgment is appropriate in cases "where the underlying facts are undisputed and the record reveals no evidence from which reasonable persons might draw conflicting inferences about these facts." *Smith v. Mobil Corp.,* 719 F.2d 1313, 1315 (5th Cir.1983), quoting *Bertrand v. Int'l Mooring and Marine, Inc.,* 700 F.2d 240, 244 (5th Cir.1983). Because there is no dispute as to the underlying material facts in this case, the court resolves the issue presented by the application of legal principles to specific underlying facts. *Bertrand,* 700 F.2d at 244 (additional citations omitted).

## DISCUSSION

### I. *Justiciability of Schuehle's Claim*

■ Schuehle seeks a declaratory judgment that federal defendants may not enforce the ESA against him because the Edwards species are beyond the reach of Congress' powers under the Commerce

Clause. When considering a declaratory judgment action, a district court must initially determine whether the declaratory action is justiciable. *Orix Credit Alliance, Inc. v. Wolfe,* 212 F.3d 891, 895 (5th Cir.(Tex.) 2000). Typically, this becomes a question of whether an "actual controversy" exists between the parties to the action. *Id.* (citing *Rowan Cos. v. Griffin,* 876 F.2d 26, 27–28 (5th Cir.1989)). As a general rule, an actual controversy exists where "a substantial controversy of sufficient immediacy and reality [exists] between parties having adverse legal interests." *Orix Credit,* 212 F.3d at 896 (citing *Middle South Energy, Inc. v. City of New Orleans,* 800 F.2d 488, 490 (5th Cir.1986)).

The federal defendants and the Sierra Club both argue that Schuehle's challenge to the constitutionality of the ESA is not ripe for adjudication unless and until the federal government actually instigates enforcement action against him. Schuehle has not alleged that any enforcement action has yet been taken against him. The Sierra Club also challenges Schuehle's standing to bring the suit.

### A. *Ripeness*

■ A declaratory judgment action must be ripe in order to be justiciable. *Orix Credit,* 212 F.3d at 896 (citing *United Transp. Union v. Foster,* 205 F.3d 851, 857 (5th Cir.2000) ("Declaratory judgments are typically sought before a completed 'injury-in-fact' has occurred ... but still must be limited to the resolution of an 'actual controversy.' ")). *See also Martin Tractor Co. v. Federal Election Comm'n,* 627 F.2d 375, 379 (D.C.Cir.1980) ("ripeness is in part an expression of the court's inherent discretion when declaratory or injunctive relief is sought"). In *New Orleans Public Serv., Inc. v. Council of New Orleans,* the Fifth Circuit set out the prevailing stan-

dards for determining whether a dispute is ripe for adjudication:

> A court should dismiss a case for lack of "ripeness" when the case is abstract or hypothetical. *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985); *Socialist Labor Party v. Gilligan,* 406 U.S. 583, 588–89, 92 S.Ct. 1716, 1719–20, 32 L.Ed.2d 317 (1972).

> The key considerations are "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *Placid Oil Co. v. Federal Energy Regulatory Commission,* 666 F.2d 976, 981 (5th Cir.1982).

> A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required. *Thomas,* 105 S.Ct. at 3333.

*New Orleans Public Serv., Inc. v. Council of City of New Orleans,* 833 F.2d 583, 586–87 (5th Cir.1987). *See also Orix Credit,* 212 F.3d at 895.; *United Transp. Union,* 205 F.3d at 857.

Defendants argue that, since Schuehle has not been sued pursuant to § 9 of the ESA for "taking" Edwards species, his as-applied challenge to the constitutionality of that statute is not ripe for review. Indeed, Defendants argue, there is no indication that the ESA will ever be applied to Schuehle in the context of the Edwards species.

■ Additionally, Sierra Club produced an letter to Schuehle dated March 30, 2000, from its counsel Stuart N. Henry, stating that "to the extent the notice of intent to sue letters of April 12, 1990 and April 15, 1994 are treated as indicating an intent to sue you as a pumper for violations of the Endangered Species Act, Sierra Club hereby rescinds and withdraws those notices as to you, and only as to you." Defendants rely on this letter to bolster their contention that this suit is not ripe. Sierra Club's afterthought attempt to moot Schuehle's claims is ineffective, however, because a change of activity by a defendant under the threat of judicial scrutiny is insufficient to negate the existence of an otherwise ripe case or controversy. *Armster v. United States Dist. Court for Centr. Dist. of Cal.,* 806 F.2d 1347, 1357 (9th Cir.1986) (citing *United States v. W.T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)).

Three of the key cases Defendants cite for the proposition that an "as-applied" challenge is not ripe for review until the government actually applies the law to the claimant in the complained-of manner can be distinguished from the instant case. In *Hodel v. Virginia Surface Mining and Reclamation Ass'n,* 452 U.S. 264, 297, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), the court held that a takings issue was unripe because the potential for administrative solutions still existed. Here, no such alternative solutions exist. The Court's determination awaits no agency action. Either it is or it is not constitutional for § 9 to be applied to Schuehle, and his civil and criminal liability for pumping water from the Edwards wells directly hinges on the Court's determination. At issue in *Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 60, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989) is whether civil sanctions under the RICO statute are so severe as to render the statute unconstitutional. The *Fort Wayne* court held that issue to be unripe because the state had not sought any civil penalties, and stated that the issue could be reviewed only when remedies were enforced against the defendant. It had not yet been established whether the *Fort Wayne* defendant's actions even constituted a RICO violation, however. In the case at bar,

Schuehle does not challenge on summary judgment either USFWS's determination of minimum springflows needed to prevent take, jeopardy, or adverse modification of critical habitat or the fact that withdrawals from the Edwards Aquifer can contribute to takes when springflows are at their minimum levels. Thus, further pumping by Schuehle at minimum springflow conditions arguably does cause a violation of the take provision and sets the stage for government enforcement of the ESA against him. In *Eide v. Sarasota County*, 908 F.2d 716, 724–26 (11th Cir.), *cert. denied*, 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991), the court held that a zoning decision cannot be the subject of an as-applied challenge until the decision to apply the regulation to the plaintiff's property has been made. By contrast, in the instant case, the decision by the Sierra Club to "take prompt legal action to obtain judicial remedies for this emergency" had been made, as stated in its April 15, 1994 letter.

■■■ Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial review. *United Transp. Union*, 205 F.3d at 857 (citing *Abbott Lab. v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). Schuehle has curtailed his irrigation pumping on the Cole Dairy and Wurzbach properties to his financial detriment, in response to credible threats of either prosecution or litigation by the Sierra Club and USFWS. The Sierra Club Notices of Intent to Sue, the first step required in the litigation process,[9] served to remind Schuehle of his obligation to refrain from withdrawing Edwards water during minimum springflow

levels, to avoid violation of the ESA. In *United Transportation Union*, the Fifth Circuit found a claim challenging a statute requiring the equipping and use of certain signaling devices on locomotives to be ripe, in the context of a pre-enforcement review, because it imposed immediate obligations on the railroad, including potential equipment modifications and operating modifications. 205 F.3d at 855–56, 858. In the instant case, when springflow is at minimum levels, the ESA effectively imposes immediate obligations on Edwards pumpers such as Schuehle to reduce or altogether cease their pumping activities or risk civil litigation and/or criminal penalties.

■■■ The issues presented in this case are fit for judicial decision because the Sierra Club has litigated previous ESA violations by the Edwards pumpers and their Intent to Sue letters to Schuehle demonstrate the viable threat posed to him if he resumes his normal pumping activities. Schuehle should not be placed in the unenviable position that, in order to test the constitutionality of the ESA, he must expose himself to civil and criminal liability. One challenging a statute must demonstrate that he is immediately injured or jeopardized by its operation. *International Tape Mfrs. Ass'n v. Gerstein*, 494 F.2d 25, 28 (5th Cir.1974). An official's threat to enforce the statute against the plaintiff may be enough to create ripeness if the plaintiff alleged he had engaged, was engaging or desired to engage in the prohibited activity. *Id.* (citations omitted). A specific threat of enforcement is not mandatory, but plaintiffs must somehow demonstrate that the statute poses more than an imaginary threat to their well-being. *Id.* (citation omitted). It is uncontroverted that Schuehle has engaged in pumping from the Edwards Aquifer and desires to

---

**9.** No action may be commenced under the citizen suit provision of the ESA prior to

Plaintiff giving a 60 day notice of intent to sue under the ESA. *See* 16 U.S.C. § 1540(g)(2)(A).

continue this activity. Further, Sierra Club's threat of suit against Schuehle in light of their previous actions demonstrate more than an imaginary threat to his ability to continue pumping.

Pre-enforcement review is especially appropriate in this case because of the significant and continual economic harm that Schuehle may suffer if the Court withholds review on ripeness grounds. *See United Transp. Union,* 205 F.3d at 859. Thus, Schuehle's claims satisfy the hardship prong set forth in *New Orleans Public Service.*

Finally, the only questions this Court needs to decide in this case—the constitutionality of § 9 as applied to Schuehle and whether the Sierra Club's use of the citizen suit provision of the ESA constitutes an invalid delegation of legislative policymaking authority—are purely legal ones. Thus, they are appropriate for judicial review. *Id.* (citing *New Orleans Pub. Serv.,* 833 F.2d 583). Although the ripeness determination is a close one, this Court concludes that this case is ripe for judicial review, for the reasons cited.

## B. Standing

■■■ The Sierra Club takes issue with Schuehle's failure to identify in which capacity he is suing—in his official capacity as a member of the Edwards Aquifer Authority Board or as an Edwards pumper in his individual capacity, asserting that he lacks standing in either capacity. Although Schuehle characterizes himself as both "EAA Board Member Hunter Schuehle" and "a pumper and consumer of Edwards water" in his First Amended Complaint, he has admitted in his response to Requests for Admissions that he has not been authorized by the EAA to sue on its behalf. Schuehle points to no provision in the EAA statute that would authorize an individual member to act on behalf of the EAA Board. The real party in interest in

an official capacity suit is the entity represented and not the individual officeholder. *Karcher v. May,* 484 U.S. 72, 78, 108 S.Ct. 388, 98 L.Ed.2d 327 (1987). Schuehle's status as an EAA board member does not permit him to "step into the shoes of the Board" and invoke its right to bring a lawsuit on EAA's behalf. *See Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 544, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). Therefore, the Sierra Club is correct that Schuehle lacks standing to sue in his official capacity.

■■■ Regarding standing to sue in his individual capacity, Schuehle owns the Cole Dairy, Wurzbach property and Frio River Ranch, all of which contain water wells which have historically pumped water from the Edwards Aquifer for various uses, including domestic, livestock and agricultural purposes. Schuehle pumped Edwards water to irrigate his Cole Dairy and Wurzbach properties, then reduced his irrigation pumping due to the Sierra Club's Notices of Intent to Sue letters, the USFWS letters and newspaper accounts outlining USFWS' intentions to enforce the ESA requirements. Schuehle's affidavit is unclear regarding whether he continues to pump from the Edwards wells for non-irrigation purposes.

■■■ Defendants contend that Schuehle's claims fail to satisfy the standing requirements imposed by the "case" or "controversy" provision of Article III because he suffered no concrete or particularized injury. This "irreducible constitutional minimum" of standing requires: (1) that the plaintiff have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the chal-

lenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The uncontroverted summary judgment evidence demonstrates that Schuehle received irrigation water from the Edwards Aquifer for his Cole Dairy and Wurzbach properties, and that the determination of minimum springflow levels determined by USFWS adversely affected him by ultimately causing him to decide to substantially reduce his irrigation activities. Defendants contend that these facts fail to satisfy the "injury in fact" element of Article III standing because Schuehle has not demonstrated that he is being harmed in performing his pumping. Further, they claim, Schuehle fails to allege that the Sierra Club provided him as an Edwards pumper with the requisite 60 day notice under the ESA that the intention is to sue him under the Act. Therefore, the Sierra Club contends, he is not even threatened with legal action.

The USFWS determination of springflow requirements to avoid a taking or jeopardy constituted notice to Schuehle and other Edwards pumpers that additional pumping would result in a violation of the ESA if springflow levels were at their minimum. Schuehle has been adversely affected as a result, because he was not then free to pump without civil and criminal liability. The specific facts that support his injury are his economic loss resulting from curtailing and ceasing his pumping activities. Schuehle therefore provides sufficient facts to establish the requisite injury in fact. Schuehle's injury is "fairly traceable" to the USFWS's determination of springflow requirements. It is

"redressable" by a favorable judicial ruling, because he will not be liable for any "taking" of Edwards species should the Court hold § 9 of the ESA unconstitutional.

▆▆▆▆ In addition to civil fines, the ESA provides criminal penalties for those individuals found in violation of the statute. A credible threat of imminent prosecution can injure the threatened party by putting him between a rock and a hard place—absent the availability of preenforcement review, he must either forego possibly lawful activity because of his well-founded fear of prosecution, or willfully violate the statute, thereby subjecting himself to criminal prosecution and punishment. *Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C.Cir.1997) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298–99, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). In such situations the threat of prosecution provides the foundation for justiciability as a constitutional and prudential matter, and the Declaratory Judgment Act, 28 U.S.C. § 2201 (1994), provides the mechanism for seeking preenforcement review in federal court. *Navegar*, 103 F.3d at 998–99 (citing *Steffel v. Thompson*, 415 U.S. 452, 480, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974)) ("the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity"). In this case, threats of enforcement by the Sierra Club and the USFWS simultaneously ripen Schuehle's preenforcement challenge and gives him standing. *See Navegar*, 103 F.3d at 998.

Having decided that this case is justiciable, the Court now proceeds to the merits of Schuehle's claims.

## II. Constitutionality of the Take Provision of the ESA as Applied to the Edwards Species

The United States Constitution grants Congress the power "to regulate Com-

merce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. The regulated activity at issue in this case is "takes" of the Edwards species as that term is used in § 9(a)(1)(B) of the ESA and the regulation adopted pursuant to the ESA. Schuehle alleges that the ESA cannot apply to protect species that are native to the Edwards Aquifer because the regulated activity at issue is not "commercial" in nature and it is an entirely intrastate activity. He further contends that Congress has made no finding that takes of endangered species have a substantial effect on interstate commerce. Finally, he argues that, as applied to the Edwards species, the regulated activity significantly intrudes into areas of traditional state authority: groundwater ownership and regulation, wildlife management, and land use.

As previously discussed, this Court has previously addressed the constitutionality of the ESA as applied to the Edwards endangered species in *Sierra Club v. San Antonio*, No. MO–96–CA–97 (W.D.Tex. 1996). In that case, this Court aligned itself with the court in *Palila v. Hawaii Dept. of Land and Natural Resources*, 471 F.Supp. 985 (D.Haw.1979) in holding that the ESA may apply to protect such species if they substantially affect interstate commerce of some kind, even if the species are not bought or sold across state lines. The *Palila* court found that the ESA could protect the Palila bird, an endangered bird found only within Hawaii, because of interstate interest in viewing the species:

> Congress has determined that protection of any endangered species anywhere is of the utmost importance to mankind, and that the major cause of extinction is destruction of natural habitat. In this context, a national program to protect and improve the natural habitats of endangered species preserves the possibilities of interstate commerce in these species and of interstate movement of persons, such as amateur students of nature or professional scientists who come to a state to observe and study these species, that would otherwise be lost by state inaction.

*Palila*, 471 F.Supp. at 994–95 (citing *Brown v. Anderson*, 202 F.Supp. 96 (D.Alaska 1962) (indirectly supporting the proposition that federal power over wildlife derives from the interstate movement of persons utilizing or studying wildlife)). *Palila* thus concluded that the Tenth Amendment does not restrict enforcement of the Endangered Species Act, because of the power of Congress to regulate commerce. *Palila*, 471 F.Supp. at 995.

This Court also based its decision in *Sierra Club v. City of San Antonio* on the principles enunciated in *Utah v. Marsh*, 740 F.2d 799 (10th Cir.1984). In *Marsh*, the court found that the plaintiff's discharge of dredged or fill material into Utah Lake, located entirely within the state, could well have a substantial economic effect on interstate commerce because, *inter alia*, waters from Utah Lake are used to irrigate crops which are sold in interstate commerce; the lake also provides recreationists with the opportunity to observe, photograph, and appreciate a variety of bird and animal life; and nonresident visitation at the lake has averaged 2% of total visitation. *Marsh*, 740 F.2d at 803–04. The *Marsh* court noted that such interstate movement of travelers has been held to be within the reach of the Commerce Clause. *Id.* at 804. In *Sierra Club v. San Antonio*, this Court found that, among other things, that persons travel from out of state to study and observe the Edwards species. Unless subsequent persuasive authority to the contrary exists, this Court sees no reason to depart from its conclusion set forth in *Sierra Club v. San Antonio* that the ESA is a constitutional exercise of Congressional authority.

### A. The Three–Pronged Lopez Test, the Rational Basis Requirement and the Aggregation Principle

Schuehle contends that the conclusion the take provision exceeds Congress' Commerce Clause authority is consistent with *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), a case pre-dating this Court's ruling in *Sierra Club v. San Antonio. Lopez* recognized limits to the reach of the interstate commerce clause by holding that Gun–Free School Zones Act, making it federal offense for any individual knowingly to possess firearm at a place that an individual knows or has reasonable cause to believe is a school zone, exceeded Congress' commerce clause authority, since possession of gun in local school zone was not economic activity that substantially affected interstate commerce. *Lopez,* 514 U.S. at 567, 115 S.Ct. 1624. *Lopez* set forth the three broad categories of activity that Congress may regulate consistent with the commerce clause: "First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." *Lopez,* 514 U.S. at 558–59, 115 S.Ct. 1624 (citations omitted).

In *Wickard v. Filburn,* 317 U.S. 111, 124, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the Supreme Court found that the effect of consumption of homegrown wheat had a substantial effect on interstate commerce, thus making its regulation by Congress appropriate. Since *Wickard* was decided, the Supreme Court has undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce. *Lopez,* 514 U.S. at 557, 115 S.Ct. 1624 (citing *Hodel,* 452 U.S. at 276–280, 101 S.Ct. 2352; *Perez v. United States,* 402 U.S. 146, 155–156, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *Katzenbach v. McClung,* 379 U.S. 294, 299–301, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 252–253, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964)).

In *United States v. Knutson,* 113 F.3d 27 (5th Cir.1997), the Fifth Circuit considered whether a federal law prohibiting the transfer or possession of machine guns exceeded Congress' power under the Commerce Clause. The Court recognized the three categories of activity that Congress may regulate under the Commerce Clause identified in *Lopez,* and applied the "rational basis" principle to the "substantial effect" category. *Knutson,* 113 F.3d at 29. The Court found the statute constitutional because Congress could have had a rational basis for concluding that the statute regulates conduct that has a substantial effect on interstate commerce. *Id.* at 31. The Fifth Circuit further refined the application of the *Lopez* analysis in assessing whether Congress acted constitutionally in enacting a particular statute, as applied to interstate activities, in *United States v. Robinson,* 119 F.3d 1205, 1214–15 (5th Cir. 1997). In *Robinson,* a defendant convicted under the Hobbs Act of conspiracy and aiding and abetting three robberies challenged the constitutionality of the Act, which assesses criminal penalties for interference with interstate commerce by a robbery, an act of extortion, or an attempt or conspiracy to rob or extort. *Id.* at 1208, 1215. The *Robinson* court stated:

> [U]nder the third category of the commerce power described in Lopez, the particular conduct at issue in any given case need not have a substantial effect

upon interstate commerce. Congress is free to act—and the government to apply the law—so long as the regulated activity, in the aggregate, could reasonably be thought to substantially affect interstate commerce.

*Id.* The *Robinson* court found that the defendant's as-applied challenge to the Hobbs Act collapsed in the face of the aggregation principle, even though individual instances of the regulated activity may not have substantially affected interstate commerce. *Id.* at 1215. However, the class of activities analysis set forth in *Robinson* must be read in the context of a prosecution under the Hobbs Act, a statute providing for an interstate commerce nexus. *United States v. Bird,* 124 F.3d 667, 677 n. 12 (5th Cir.1997); *see Robinson,* 119 F.3d at 1213 (jurisdictional element explicitly limits the scope of the Hobbs Act to those robberies and extortion schemes which affect interstate commerce).

Since this Court's Aug. 9, 1996 order was entered in *Sierra Club v. San Antonio,* two circuit courts of appeals have addressed the constitutionality of the ESA: *National Ass'n of Home Builders v. Babbitt,* 130 F.3d 1041 (D.C.Cir.1997) (holding that the ESA can protect a species that lives in only one state, by virtue of the national interest in biodiversity and other factors) and *Gibbs v. Babbitt,* 214 F.3d 483. 492 (4th Cir.2000) (finding that a USFWS regulation limiting the taking of red wolves on private land pursuant to its authority under the ESA is within the reach of congressional authority under the Commerce Clause). Also, the Supreme Court decided another case that further defined the outer limits of the commerce clause, *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (holding that Commerce Clause did not provide Congress with authority to enact civil remedy provision of Violence Against Women Act, inasmuch as provision was not regulation of activity that substantially affected interstate commerce). In light of *National Association of Home Builders, Gibbs, Morrison,* and *Lopez*—as interpreted by the Fifth Circuit in *Robinson* and *Bird,* the Court now revisits the issue of whether Congress has the authority to regulate the Edwards species pursuant to the Commerce Clause.

### B. Evaluating the Take Provision by Applying the Lopez Categories of Activity

■ In this instance, analysis under two of three *Lopez* categories (one and three) is appropriate. *Lopez* category two does not apply because section 9(a)(1) of the ESA is not a regulation of the instrumentalities of interstate commerce or of persons or things in interstate commerce. *National Ass'n of Home Builders,* 130 F.3d at 1046 (rejecting notion that endangered species of fly found only in California was "thing in interstate commerce," in action challenging constitutionality of "taking" provision of ESA). Although Edwards species are captured, shipped to and traded among various museums and zoos, this is not sufficient to make the them instrumentalities or things in interstate commerce. *See Gibbs,* 214 F.3d at 491 (4th Cir.2000) (rejecting conclusion that endangered red wolves are things in interstate commerce, notwithstanding that they were transported interstate for the purposes of study and reintroduction programs). *See also Lopez,* 514 U.S. at 559, 115 S.Ct. 1624 (rejecting application of *Lopez* prong two to Gun–Free School Zones Act, despite the fact that the regulated guns likely traveled through interstate commerce).

■ The Court now focuses on the remaining *Lopez* categories of activity—channels of interstate commerce and substantial effect on interstate commerce. In evaluating whether ESA section 9(a)(1) is

a regulation of the use of the channels of interstate commerce or of activity that substantially affects interstate commerce, we may look not only to the effect of the extinction of the individual endangered species at issue in this case, but also to the aggregate effect of the extinction of all similarly situated endangered species. *Id.*

### a. Channels of Interstate Commerce

■ *National Ass'n of Home Builders* identifies two reasons why the power of Congress to regulate the channels of interstate commerce provides a justification for section 9(a)(1) of the ESA: First, the prohibition against takings of an endangered species is necessary to enable the government to control the transport of the endangered species in interstate commerce. 130 F.3d at 1046. One of the most effective ways to prevent traffic in endangered species is to secure the habitat of the species from predatory invasion and destruction. *Id.* at 1047. Therefore, section 9(a)(1) of the ESA can be properly upheld as a regulation of the use of the channels of interstate commerce. *Id.*

Second, the prohibition on takings of endangered animals falls under Congress' authority " 'to keep the channels of interstate commerce free from immoral and injurious uses.' "*Id.* at 1046 (citing *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624, in turn quoting *Heart of Atlanta Motel Inc. v. United States,* 379 U.S. 241, 256, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964)). In the instant case, Congress used its authority to rid the channels of interstate commerce of injurious uses to directly regulate "takes" of endangered species. By conferring authority on the Secretary of the Interior to develop a recovery plan for the conservation of such species,[10] Congress indirectly regulates the conditions under which irrigation water is used to produce crops for sale or other use in interstate commerce. Congress used this authority to prevent the eradication of endangered species by persons whose economic activity threatens their habitat, such as Edwards pumpers who draw down the Springs by excessive water withdrawals. Edwards pumpers use water from the Edwards Aquifer to irrigate crops which are sold in interstate commerce or which are consumed and otherwise used within the state of Texas. Under *Wickard's* aggregation principle, the regulated intrastate activity is of an apparent commercial character and is also subject to federal regulation under the Commerce Clause. *Morrison,* 120 S.Ct. at 1750 n. 4. Thus, regulations preventing the taking of endangered species prohibit interstate actors from using the channels of interstate commerce to "promot[e] or spread[ ] evil, whether of a physical, moral or economic nature." *National Ass'n of Home Builders,* 130 F.3d at 1048 (quoting *North Am. Co. v. S.E.C.,* 327 U.S. 686, 705, 66 S.Ct. 785, 90 L.Ed. 945 (1946)). Congress is therefore empowered by its authority to regulate the channels of interstate commerce to prevent the taking of endangered species in cases like this where the pressures of interstate commerce place the existence of species in peril. *Id.*

### b. Substantially Affects Interstate Commerce

■ There is no question that Congress is able to regulate noncommercial, interstate activity that substantially affects interstate commerce. *Bird,* 124 F.3d at 676. However, where a statute has no jurisdictional nexus, a greater showing is

---

**10.** The Secretary of the Interior is directed to develop and implement recovery plans for the conservation and survival of endangered species and threatened species listed pursuant to the ESA, unless he finds that such a plan will not promote the conservation of the species. 16 U.S.C.A. § 1533(f)(1) (2000).

required than (1) the statute prohibits a class of activities and (2) when viewed in the aggregate, these activities may substantially affect interstate commerce in some broad and general sense. *Id.* at 677. In the absence of a jurisdictional element, a limiting principle is required, which identifies "judicially enforceable outer limits" to Congress' exercise of power under the Commerce Clause. *Id.* A limiting principle is something that relevantly ties the separate incidents and their effects on interstate commerce together. *See Bird,* 124 F.3d at 677 (citing *Wickard,* 317 U.S. at 128, 63 S.Ct. 82 (offering, as a limiting principle, the national wheat market); *Perez,* 402 U.S. at 156, 91 S.Ct. 1357 (national market for commercial credit was limiting principle); *United States v. Lopez,* 2 F.3d at 1351, 1367 n. 51 (5th Cir.1993) (noting "fungible and untraceable" characteristic of narcotics—which Congress found made federal regulation of intra state trafficking an operationally necessary prerequisite to effective regulation of the inter state activity—was a tying feature) (citations omitted), *aff'd* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)); *Bird,* 124 F.3d at 678 (presence of national commercial market in abortion-related services, together with the effects on such market of the proscribed conduct, was limiting principle).

### i. Limiting Principle: Potential for Future Commerce Related to Genetic Diversity such that the Regulated Activity Substantially Affects Interstate Commerce

Unlike the statute at issue in *Robinson,* the take provision of the ESA contains no jurisdictional element which would ensure, through case-by-case inquiry, that the take of the endangered species in question affects interstate commerce. 16 U.S.C. § 1538(a)(1)(B) (1985). In contrast, jurisdictional elements *are* present in other ESA sections (§ 9(a)(1)(E) and

§ 9(a)(1)(F)). The statute states, in relevant part:

(1) . . . with respect to any [listed] endangered species of fish or wildlife . . . it is unlawful for any person . . . to—. . .

(B) take any such species into, or export any such species from the United States; . . .

(E) deliver, receive, carry, transport, or ship, *in interstate or foreign commerce,* any such species and in the course of a commercial activity, any such species:

(F) sell or offer for sale *in interstate or foreign commerce* any such species;

. . .

16 U.S.C. § 1538(a)(1)(B), (E), (F) (1985) (emphasis supplied). Consequently, the Court's inquiry must determine whether the take provision of the ESA proscribes intrastate activity that has (or might have) a substantial effect on interstate commerce *and* whether there is the potential for future commerce related to genetic diversity such that the regulated activity substantially affects interstate commerce. *See National Ass'n of Home Builders v. Babbitt,* 130 F.3d 1041, 1051 (D.C.Cir.1997). In other words, Congress must have divined the potential for a national market in endangered species of wildlife which could potentially result in trading and marketing of that species for its commercial value and because of the value of its gene material. *Cf. Bird,* 124 F.3d at 677 (requiring finding that Congress divined the existence of a national commercial market in abortion-related services in which the reduction of services in one state substantially affects the ability of clinics in other states to provide such services, and examining legislative history for support of such limiting principle).

■■■. One of the primary reasons that Congress sought to protect endangered species from "takings" was the importance

of the continuing availability of a wide variety of species to interstate commerce. *National Ass'n of Home Builders,* 130 F.3d at 1050. *National Ass'n of Home Builders* sets forth Committee Reports on the ESA which recognize the potential for future commerce related to genetic diversity:

As the House Report explained:

... As we homogenize the habitats in which these plants and animals evolved, and as we increase the pressure for products that they are in a position to supply (usually unwillingly) we threaten their—and our own—genetic heritage. The value of this genetic heritage is, quite literally, incalculable....

From the most narrow possible point of view, it is in the best interests of mankind to minimize the losses of genetic variations. The reason is simple: they are potential resources. They are keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask.

. . . . .

Who knows, or can say, what potential cures for cancer or other scourges, present or future, may lie locked up in the structures of plants which may yet be undiscovered, much less analyzed? More to the point, who is prepared to risk being [sic] those potential cures by eliminating those plants for all time? Sheer self interest impels us to be cautious. H.R.REP. NO. 93–412, at 4–5 (1973). Similarly, the Senate Report on the precursor to the ESA, noted:

... From a pragmatic point of view, the protection of an endangered species of wildlife with some commercial value may permit the regeneration of that species to a level where controlled exploitation of that species can be resumed. In such a case businessmen may profit from the trading and marketing of that species for an indefinite number of years, where

otherwise it would have been completely eliminated from commercial channels in a very brief span of time. Potentially more important, however, is the fact that with each species we eliminate, we reduce the [genetic] pool ... available for use by man in future years. Since each living species and subspecies has developed in a unique way to adapt itself to the difficulty of living in the world's environment, as a species is lost, its distinctive gene material, which may subsequently prove invaluable to mankind in improving domestic animals or increasing resistance to disease or environmental contaminant, is also irretrievably lost.

S.REP. NO. 91–526, at 3 (1969).

*National Ass'n of Home Builders,* 130 F.3d at 1050–51. In light of the potential for future commerce related to genetic diversity recognized by Congress, this Court holds that Congress was justified in concluding that the regulation of takes by § 9(a)(1)(B) of the ESA—an intrastate activity (in this case) prohibited by the Act—was necessary to ensure the future availability of endangered species with commercial value for exploitation and for genetic benefits. *See Bird,* 124 F.3d at 678 (analogous conclusion with respect to abortion-related services in national commercial market).

### ii. The Balance of the "Substantial Effects" Analysis

In evaluating Commerce Clause challenges to federal statutes, this Court must determine that there was a rational basis for Congress' conclusion that a regulated activity substantially affects interstate commerce. *National Ass'n of Home Builders,* 130 F.3d at 1051; *Knutson,* 113 F.3d 27, 29 (requiring court to analyze the take provision of the ESA under the "substantial effect" category of *Lopez* to determine whether "a rational

basis existed for concluding that [the] regulated activity sufficiently affected interstate commerce.") The Court must defer to a congressional finding that a regulated activity affects interstate commerce if there is any rational basis for such a finding. *Hodel,* 452 U.S. at 276, 101 S.Ct. 2352.

First, this Court will examine the value of biodiversity in light of the previously mentioned congressional findings on its potential for future commerce. As the legislative history of the ESA suggests, enforcement of the take provision can ultimately result in future trade in endangered species for exploitation and harvesting of such species for gene benefits. Congress had the renewal of trade in mind when it enacted the ESA. *Gibbs,* 214 F.3d at 495. The court in *National Ass'n of Home Builders* addressed the relationship between endangered species and biodiversity and the resultant effect on interstate commerce as follows:

> Approximately 521 of the 1082 species in the United States currently designated as threatened or endangered are found in only one state.... The elimination of all or even some of these endangered species would have a staggering effect on biodiversity—defined as the presence of a large number of species of animals and plants—in the United States and, thereby, on the current and future interstate commerce that relies on the availability of a diverse array of species.
>
> The variety of plants and animals in this country are, in a sense, a natural resource that commercial actors can use to produce marketable products. In the most narrow view of economic value, endangered plants and animals are valuable as sources of medicine and genes. Fifty percent of the most frequently prescribed medicines are derived from wild plant and animal species. Such medicines were estimated in 1983 to be worth over $15 billion a year.... In

addition, the genetic material of wild species of plants and animals is inbred into domestic crops and animals to improve their commercial value and productivity.

*National Ass'n of Home Builders,* 130 F.3d at 1052–53 (citations omitted). Each time a species becomes extinct, the pool of wild species diminishes. *Id.* at 1053. This, in turn, has a substantial effect on interstate commerce by diminishing a natural resource that could otherwise be used for present and future commercial purposes. *Id.* at 1053.

Next, Congressional findings also suggest that the taking of the Edwards species can be regulated by Congress as an activity that substantially affects interstate commerce because it is the product of destructive interstate competition. Prevention of destructive interstate competition is a traditional role for congressional action under the commerce clause. *Id.* at 1055–56 (citing *Hodel,* 452 U.S. 264, 101 S.Ct. 2352). This Court unqualifiedly adopts the analysis of this issue set forth in *National Ass'n of Home Builders,* 130 F.3d at 1055 (analogizing treatment of the regulation of destruction of endangered species to the ESA to regulation of destruction of the natural landscape under the Surface Mining Act).

The ESA regulates activities—destruction of endangered species and destruction of the natural landscape—that are carried out entirely within a State and which are not themselves commercial in character. *Id.* The activities, however, may be regulated because they have destructive effects on environmental quality that are likely to affect more than one State. *Id.* Section 9(a)(1) of the ESA was adopted to ensure that "growth and development" would not be at the expense of the conservation and protection of a variety of species, injury to which would have equally deleterious con-

sequences for interstate commerce. *Id.* at 1056 (quoting H.R. 37 ("Endangered and Threatened Species Conservation Act of 1973") (Findings, Purpose, and Policy), reprinted at 119 CONG. REC. 25,694, 25,694 (1973)).

▮▮▮▮ The case at bar involves a regulation of the conditions under which economic activity takes place. Congress passed the ESA in part to prevent states from gaining a competitive advantage by enacting lower regulatory standards than other states. *National Ass'n of Home Builders,* 130 F.3d at 1056. Congress was aware that no state could be expected to require significantly more endangered species protection than other states, because for each individual state, the cost of preserving a species outweighs the benefits even though in aggregate, the benefits of biodiversity outweigh the costs. *Id.* This reason for passing the ESA is recognized in the ESA's legislative history:

In its Declaration of Policy, the Senate stated as follows:

... The Congress finds and declares that—

(1) various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation;

. . . . .

(5) encouraging the States, through Federal financial assistance and a system of incentives, to develop and maintain conservation, protection, restoration, and propagation programs which meet national and international standards is a key to meeting the Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish and wildlife.

S.1983 ("Endangered Species Act of 1973") (Declaration of Policy), reprinted at 119 CONG. REC. 30,157, 30,157 (1973).

*National Ass'n of Home Builders,* 130 F.3d at 1056 n. 20. Similarly, the House stated in its declaration of findings, purpose, and policy:

... The Congress finds and declares that one of the unfortunate consequences of growth and development in the United States and elsewhere has been the extermination of some species or subspecies of fish, wildlife, and plants; that serious losses in species of wild animals with educational, historical, recreational, and scientific value have occurred and are occurring ...; that a key to more effective protection and management of native fish and wildlife that are endangered or threatened is to encourage and assist the States in developing programs for such fish and wildlife; and that the conservation, protection, restoration, or propagation of such species will inure to the benefit of all citizens.

H.R. 37 ("Endangered and Threatened Species Conservation Act of 1973") (Findings, Purpose, and Policy), reprinted at 119 CONG. REC. 25,694, 25,694 (1973).

*National Ass'n of Home Builders,* 130 F.3d at 1056 n. 20. Congress has the power under the Commerce Clause to prevent destructive interstate competition that will result in the destruction of endangered species. *Id.* at 1057. The activity at issue may be regulated because it is likely to have destructive effects on interstate commerce. *Id.* at 1056.

▮▮▮ To complete the "substantial effect" analysis, the Court examines whether it is reasonable that the take provision regulates intrastate activity that has (or might have) a substantial effect on interstate commerce. A class of activities can substantially affect interstate commerce

regardless whether the activity at issue—in this case the taking of endangered species—is commercial or non-commercial. *National Ass'n of Home Builders,* 130 F.3d at 1049. *See also Bird,* 124 F.3d at 669–70 (upholding the Freedom of Access to Clinic Entrances Act against a constitutional challenge, based on allegedly impermissible exercise of Congress' Commerce Clause power, because it proscribes intrastate, noncommercial activity and holding that statute was proper exercise of such power because it had substantial effect on interstate commerce). Schuehle argues that the regulated activity at issue is not "commercial" in nature. However, the proper test of whether an activity can be regulated under the Commerce Clause is not whether the activity is itself commercial or economic but rather whether the activity has a substantial effect on interstate commerce. *National Ass'n of Home Builders,* 130 F.3d at 1050.

In those cases where the Supreme Court has sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor. *Morrison,* 120 S.Ct. at 1750. To establish a sufficient tie to interstate commerce to come within Congress' authority, the taking of the Edwards species must be, in some sense, economic activity. *See Morrison,* 120 S.Ct. at 1744.

The take provision of the ESA is distinguishable from the statutes at issue in *Lopez* (Gun–Free School Zones Act) and *Morrison* (Violence Against Women Act) in that the latter two statutes involved activity that was noneconomic and only tenuously linked to interstate commerce. *Gibbs,* 214 F.3d at 491–92 (citing *Morrison,* 120 S.Ct. at 1751). Here, however, water irrigation of crops to maintain an economic livelihood is a primary reason to subject oneself to the peril of the take

provision. There is an ample factual basis to suggest a direct relationship between takings of the Edwards species and interstate commerce:

■ First, groundwater is an article of interstate commerce groundwater and is therefore subject to congressional regulations. *Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 953, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982) (invalidating Nebraska statute limiting the use of Nebraska ground water in adjoining states); *Old Coach Development Corp., Inc. v. Tanzman,* 881 F.2d 1227, 1232 (3d Cir.1989). The power to regulate commerce includes the power to regulate practices affecting the prices at which commodities in that commerce are dealt. *Wickard,* 317 U.S. at 128, 63 S.Ct. 82. Regulation of water use affects the price and market conditions of both the crops raised using irrigation water and the water itself. Thus, regulation of pumping activities, although conducted intrastate, would have a substantial effect on the supply curve for such commodities (agricultural products and water) and the price at which they could be sold. Therefore, the taking of Edwards species is connected to interstate markets for agricultural products and water. *See, generally, Gibbs,* 214 F.3d at 500.

The second nexus between the take provision and interstate commerce is tourism. Persons travel from other states and nations to observe the Edwards species at Aquarena Springs in San Marcos and at San Marcos and Comal Springs. Aquarena Springs attracts interstate tourism by advertising the Edwards species to those traveling the interstate highways. Regulation of takes of the species is necessary to conserve a large enough quantity of the species to sustain tourism. *See Gibbs,* 214 F.3d at 493.

Finally, the regulation of Edwards species takings is closely related to the inter-

state market for scientific research. Out of state scientists visit the San Marcos Fish Hatchery, home to endangered fountain darters and the Texas blind salamander. The University of Texas hosts field trips for visiting out of state and foreign professors to observe the species. Fountain darters are maintained and displayed at the Dallas Zoo/Dallas Aquarium. Scientific research generates jobs, deepens our knowledge of the world, and can reveal alternate uses for animals. *Gibbs,* 214 F.3d at 494. Scientific research on the Edwards species may also discover how to use the species' distinctive gene material to improve domestic animals or to increase a human's resistance to disease or environmental contaminants. Protection of the Edwards species thus encourages further research that may have inestimable future value, both for scientific knowledge as well as commercial development of the Edwards species. *Cf. id.* (asserting this conclusion regarding the protection of endangered red wolves on private land). Schuehle argues that the ESA disclaims scientific research as not being commercial, relying on the ESA's definition of "commercial activity:" Commercial activity is defined in the Act as "all activities of industry and trade, including, but not limited to, the buying and selling of commodities and activities conducted for the purpose of facilitating such buying and selling: *Provided, however,* That ***it does not include exhibition of commodities by museums or similar cultural or historical organizations.*"** 16 U.S.C. § 1532 (1985) (emphasis supplied). Schuehle misses the point, however. Scientific research, especially involving interstate travel, falls under the auspices of the commerce clause in this instance, not because it is commercial activity itself, but because it is affected by the government's regulation of Edwards pumping, an economic activity. *Compare with Morrison,* 120 S.Ct. 1740, 1750 (noting that the noneconomic, criminal nature

of the conduct at issue in *Lopez* was central to that court's decision, as the Gun-Free School Zones Act did not regulate a commercial activity, but recognizing that *Wickard*—where wheat was produced and consumed intrastate but not bought or sold—did involve economic activity).

■ Congressional findings on the effect of biodiversity on interstate commerce and the adverse effects of interstate competition enable this Court "to evaluate the legislative judgment that the activity in question substantially affected interstate commerce." *See Knutson,* 113 F.3d at 29. Congress could rationally conclude that the intrastate activity regulated by section 9 of the ESA substantially affects interstate commerce for two primary reasons: First, the provision prevents the destruction of biodiversity and thereby protects the current and future interstate commerce that relies upon it. Second, the provision controls adverse effects of interstate competition. *National Ass'n of Home Builders,* 130 F.3d at 1051. Further, a rational basis is "visible to the naked eye," because of the relationship of tourism, scientific research, and the commodities of water and crops to interstate commerce. *See Knutson,* 113 F.3d at 29. Because the activities proscribed by the ESA's take provision fall within the categories of activity that Congress may regulate under the Commerce Clause, the take provision is constitutional as applied to Schuehle.

### III. Regulation of the Edwards Species pursuant to Congress' Treaty Power

■ In addition to upholding the ESA's take provision under the Commerce Clause, this Court may independently uphold ESA provisions, including the take provision, under the Article I, Section 8 Necessary and Proper Clause and the Ar-

ticle II treaty-making power. Treaties made by the United States are the supreme law of the land under Article VI, and that "[i]f the treaty is valid there can be no dispute about the validity of the statute under Article I, Section 8, as a necessary and proper means to execute the powers of the Government." *United States v. Bramble*, 103 F.3d 1475, 1480 (9th Cir.1996) (upholding the Migratory Bird Treaty Act under the Necessary and Proper Clause and Congress's treaty-making power) (quoting *Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920)).

The Endangered Species Act recites that "the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to" several listed treaties and "other international agreements," *Palila*, 471 F.Supp. at 993 (citing 16 U.S.C. § 1531(a)(4)). Among the listed treaties is the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere.[11] *Id.;* 16 U.S.C.A. § 1531(a)(4)(C) (1985 & Supp.2000). The ESA further identifies its purpose as "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the [listed] treaties and conventions." 16 U.S.C.A. § 1531(b) (1985). The Western Hemisphere Convention includes provisions stating that it shall provide protection to "all species and genera of … native flora and fauna, … in sufficient numbers and over areas extensive enough to assure them from becoming

extinct through any agency within man's control," and that signatories "agree to adopt, or to propose such adoption to their respective appropriate lawmaking bodies, suitable laws and regulations for the protection and preservation of flora and fauna within their natural boundaries, but not included in the national parks, national reserves, nature monuments or strict wilderness reserves." 56 Stat. at 1356, 1362; *Palila*, 471 F.Supp. at 993. Given the findings and purposes of the ESA and the provisions of the Western Hemisphere Convention, "there can be no dispute about the validity of the statute (implementing the treaty) under Article I, § 8, as a necessary and proper means to execute the powers of the Government." *See id.* (finding that Congress was empowered to enact the ESA, which implements the Western Hemisphere Convention, a valid treaty) (quoting *Holland*, 252 U.S. at 432, 40 S.Ct. 382) (drawing same conclusion with respect to the Migratory Bird Treaty Act).

## IV. Sierra Club's "Exercise of Power" as it Affects Due Process

 Schuehle claims that he was deprived of his due process rights under the Fourteenth Amendment to the United States Constitution redressable through 42 U.S.C. § 1983. Schuehle challenges the constitutionality of the ESA's citizenship provision, asserting that Congress has unconstitutionally delegated legislative power by allowing any citizen to sue.

 Under 42 U.S.C. § 1983, any person who is deprived "of any rights, privileges, or immunities secured by the Constitution and laws," by any person acting under color of state law, may bring a private action to seek redress. Schuehle does not have a claim under 42 U.S.C.

**11.** Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere, October 12, 1940, United States–Oth-

er American Republics, 56 Stat. 1354, T.S. No. 981.

§ 1983 because if the Sierra Club indeed acted under color of law, it was federal law, not state law. Therefore, its actions do not form the basis of a § 1983 claim. Furthermore, Schuehle does not have a Fourteenth Amendment claim because the Fourteenth Amendment applies to the states, not to the federal government.

Additionally, Schuehle is foreclosed from bringing a suit under 42 U.S.C. § 1983 because of the comprehensive enforcement scheme of the ESA. When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983. *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (quoting *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 673, n. 2, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)) (Stewart, J., dissenting) (when "a state official is alleged to have violated a federal statute which provides its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under § 1983") The ESA does provide a comprehensive enforcement mechanism in the form of a citizen suit provision. Congress undoubtedly did not intend to preserve the § 1983 right of action when it created such a specific statutory remedy. *See id.* The existence of this express remedy demonstrates not only that Congress intended to foreclose implied private actions but also that it intended to supplant any remedy that otherwise would be available under § 1983. *See id.* Thus, even if the Sierra Club were a state actor, Schuehle's § 1983 claim would fail.

Moreover, even if Schuehle had based his claim on more fertile legal grounds than § 1983 and the Fourteenth Amendment, it is doubtful that he could have prevailed. Almost all environmental statutes contain citizen suit provisions that allow any person to act as a private attorney general to enforce government regulations. Other major environmental laws with citizen suit provisions include: Toxic Substances Control Act, 15 U.S.C. § 2619 (1998); Columbia River Gorge National Scenic Area Act, 16 U.S.C. § 544m(b)(2) (Supp.2000); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1270(a) (1986); Clean Water Act, 33 U.S.C. § 1365 (1986 and Supp.2000); Deepwater Port Act, 33 U.S.C. § 1515 (1986); Act To Prevent Pollution of Ships, 33 U.S.C. § 1910 (1986); Safe Drinking Water Act, 42 U.S.C. § 300j8 (Supp.2000); Noise Control Act, 42 U.S.C. § 4911 (1995); Energy Policy and Conservation Act, 42 U.S.C. § 6305 (1995); Resources Conservation and Recovery Act, 42 U.S.C. § 6972 (1995); Clean Air Act, 42 U.S.C. § 7604 (1995); Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9659 (1995); and Submerged Lands Act, 43 U.S.C. § 1349 (1986).

The Supreme Court has decided multiple citizen suit cases and, although it did not specifically address the constitutionality of these provisions under the separation of powers principle, it has never suggested that citizen suit provisions may be unconstitutional. *See, e.g., Friends of the Earth v. Laidlaw Environmental Servs., Inc.,* 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995); *National Sea Clammers,* 453 U.S. 1, 101 S.Ct. 2615.

Under 16 U.S.C.A. § 1540(g)(1), Congress authorized citizen suits against any person who is alleged to be in violation of the provisions of the ESA. This statute provides:

(g) Citizen Suits

(1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf— (A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; ...

16 U.S.C.A. § 1540(g)(1) (1985). The citizen suit provision limits a citizen's authority to carry out an enforcement action to instances when government authorities decline to act, however. According to the citizen suit provision, a person may not proceed with a suit until 60 days after he files a notice of the violation with the Secretary of the Interior and the alleged violator. 16 U.S.C.A. § 1540(g)(2)(A)(i) (1985). Furthermore, a person may not proceed with his suit if the Secretary commences civil proceedings or a criminal action based on the alleged violation. 16 U.S.C.A. § 1540(g)(2)(A)(ii), (iii) (1985).

■■■■■ Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition, who may enforce them and in what manner. *Davis v. Passman*, 442 U.S. 228, 241, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). Thus, Congress may expand individual rights by express legislation, by adding a citizen suit provision to public law. Here, the citizen suit provision of the ESA provides clear evidence that Congress wanted to recognize a private right of action in the absence of the Secretary's own initiative to act. This Court is not oblivious to the longstanding controversy regarding the delegation of enforcement power to third parties, as summarized by Professors Barry Boyer and Errol Meidinger:

Private delegations of enforcement power may be as suspect as private delegations of rulemaking authority because they bypass the existing structure of limited authority and political accountability that confines the powers of the regulatory state.... [On the other hand, t]o the extent that regulation serves "the people" rather than "the industry" or "the bureaucrats," it gains legitimacy. Conversely, it forfeits that legitimacy when it becomes captive to the will of the industries or bureaucrats. From this perspective, private enforcement may be viewed as the ultimate legitimating device, since it gives the effective power to initiate regulation back to the people themselves.

Eileen Gauna, *Federal Environmental Citizen Suit Provisions: Obstacles and Incentives on the Road to Environmental Justice*, 22 ECOLOGY L.Q. 1, 87 (1995) (citation omitted). However, Congress understood that there would be undesirable underenforcement of environmental laws because of limited regulatory resources— that is why it equipped many federal environmental laws with citizen suit provisions. *Id.* at 40. This Court casts its lot with those who argue that the citizen suit is a legitimate means by which the people themselves can initiate regulation when the existing authorities elect not to do so. Thus, the ESA citizen suit provision does not represent an unlawful delegation of rulemaking authority.

## CONCLUSION

The Endangered Species Act is a valid exercise of Congressional power pursuant to the treaty-making power and the Commerce Clause of the United States Constitution. The citizen provision of the ESA does not impermissibly delegate legislative power to the Sierra Club, a private entity. Accordingly,

IT IS ORDERED that Plaintiff Hunter Schuehle's Motion for Summary Judgment is hereby **DENIED**.

**IT IS FURTHER ORDERED** that Federal Defendants' Motion for Summary Judgment is hereby **GRANTED** on the merits.

**IT IS FINALLY ORDERED** that Defendant Sierra Club's Motion for Summary Judgment is also hereby **GRANTED** on the merits.