**SAVE OUR AQUIFER, an Unincorporated Association, et al., Plaintiffs,**

**and**

**League of United Latin American Citizens (LULAC) District 15, Plaintiff–Intervenor,**

**v.**

**CITY OF SAN ANTONIO, et al., Defendants.**

**No. CIV.A.SA–02–CA–618–F.**

United States District Court, W.D. Texas, San Antonio Division.

Dec. 16, 2002.

Nina Perales, Mexican American Legal Defense, San Antonio, TX, Amy H. Kastely, Center for Legal and Social Justice, San Antonio, TX, Leticia M. Saucedo, Mexican American Legal Defense & Educ. Fund, Inc., San Antonio, TX, Isabel Cristina de la Riva, Les Mendelsohn & Associates, P.C., San Antonio, TX, Joseph

Pacifico Berra, Mexican American Legal Defense and Educational Fund, San Antonio, TX, for Plaintiffs.

George Joseph Korbel, Texas Rural Legal Aid, San Antonio, TX, Rolando L. Rios, Attorney at Law, San Antonio, TX, for Defendants.

## ORDER REGARDING PLAINTIFFS' MOTION FOR SECOND TEMPORARY RESTRAINING ORDER

BIERY, District Judge.

A fable by the Court:

> Once upon a time there were two armies of *Amphibia Anura.*

> One army was pitched into a tub of boiling water. The frenetic frogs reflexively jumped out and saved themselves.

> The second frog army was put in a pot of tepid liquid, gradually warmed to the boiling point, too late realizing: They were cooked.[1]

\*      \*      \*      \*      \*      \*

The flood of lawsuits anticipated over a proposed upscale golf resort begins with this unique set of facts brought under the Voting Rights Act of 1965 and other legal theories. The underlying current of the litigation is long standing concern about the main source of water lying under this region.[2] Hanging over these issues are the clouds of extreme term limits and allegations of a tainted political process.[3]

---

1. Based on a study in E.W. Scripture's The New Psychology, published 1897, in London. E.W. SCRIPTURE, THE NEW PSYCHOLOGY 300–301(W. Scott ed. 1897).

2. *See Sierra Club v. Lujan,* No. MO–91–CA–069, 1993 WL 151353 (W.D.Tex. Feb. 1, 1993) (Bunton, J.); *Shields v. Babbitt,* 229 F.Supp.2d 638 (W.D.Tex.2000) (Bunton, J.), *vacated sub nom, Shields v. Norton,* 289 F.3d 832 (5th Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 663, —— L.Ed.2d —— (2002).

3. *Dutmer v. City of San Antonio,* 937 F.Supp. 587, 589, 595 (W.D.Tex.1996) (Biery, J.) ("If history judges the [San Antonio] term limits movement an idea whose time should not have come, the evolutionary experiment called democracy includes the right to make mistakes and, ultimately, delivers just about the kind of government voters deserve.... Those who believe the [term limits] Ordinance a malignancy on the body politic may have to await the appearance of symptoms to attempt persuasion of a majority to perform corrective surgery at the ballot box."); *United States v. Martin & Sanders,* No. SA–02–CR–527 (W.D.Tex. Oct. 9, 2002).

Plaintiffs apparently are fearful we *Homo Sapiens* will figuratively boil ourselves before realizing too late what we have done. Plaintiffs Save Our Aquifer ("SOA") and others allege causes of action under:

* Section 2 of the Voting Rights Act, 42 U.S.C. § 1971;
* Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c;
* The Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV, § 2;
* The Texas Open Meetings Act, TEX. GOV'T CODE ANN. § 551.142 (Vernon 1988).

Initially, plaintiffs seek to temporarily restrain "defendants from taking any action to implement the 'PGA Village Agreement in Lieu of Annexation' approved October 24, 2002 and from taking any other action to implement the PGA Village Project without first submitting the matter to a vote of the electors or submitting the voting change to preclearance by the Department of Justice, in compliance with Section 5 of the Voting Rights Act." Defendants contend plaintiffs have not shown they are entitled to injunctive relief and have not shown a voting change subject to preclearance.

### Background

The Professionals Golfers' Association of America ("PGA") Village is planned for land north of San Antonio on a nearly 2,900 acre site which was purchased by Lumberman's Investment Corporation ("Lumberman's") in the mid–1980s. The property spreads across the Edwards Aquifer Recharge Zone. The original PGA Village concept negotiated between the San Antonio City Council and Lumberman's, on behalf of the PGA, would have granted the developer taxing authority as a special conservation district.

A bill was passed by the legislature which allowed for the creation of the taxing entity (SB 1629), which was to be the Cibolo Canyon Conservation and Improvement District No. 1. As the law required formal city council agreement before the entity could go into effect, city council held a number of hearings and voted nine to two in favor of the creation of the conservation district pursuant to Ordinance No. 95579.

Community activist groups, citing danger to the Edwards Aquifer and contending a for-profit entity should not be given the taxing authority of a governmental unit, launched a petition drive in April, 2002. Opposition to the development in the Cibolo Canyon was led by three groups: Communities Organized for Public Service ("COPS") and Metro Alliance ("METRO") and SOA. COPS and METRO are long established "public watch dogs," while SOA is recently formed. A referendum petition was circulated and supplemented. The petition requested city council to either repeal Ordinance No. 95579 or submit it to a vote of the electors as a referendum. Specifically, the petition stated:

### PETITION TO REPEAL ORDINANCE NO. 95579 (THE "PGA VILLAGE ORDINANCE")

TO THE CITY COUNCIL OF SAN ANTONIO:

We the undersigned, together with the signatories to the multiple counterparts of this Petition, being ten percent or more of the electors qualified to vote at the last preceding regular election of the City of San Antonio (the "City"), hereby respectfully petition and request that: **Ordinance No. 95579 approving a development agreement between the City, Cibolo Canyon Conservation and Improvement District No. 1, Bexar County, Texas, and Lumberman's Investment Corporation (the "PGA Vil-**

lage Ordinance") be either repealed by the City Council of the City of San Antonio or submitted to a vote of the electors of the City of San Antonio as provided by article IV, § 35 of the Charter of the City of San Antonio.

(Emphasis added). The drive garnered approximately 107,000 signatures, 77,419 of which were certified as registered voters by the city clerk, Norma Rodriguez.

This case began as an attempt by SOA and the individual plaintiffs to enjoin the City, acting by and through its city clerk, from the use of computers to sort petition signatures by requiring the city clerk to verify each of the more than 100,000 signatures. Plaintiffs alleged that computers were being used to count the signatures and to qualify or disqualify persons as registered voters in violation of the Voting Rights Act. In their complaint, plaintiffs alleged: "Thousands of people disqualified through this computer-referenced process are qualified registered voters and a disproportionate number of disqualified voters are members of minority racial, ethnic, or language groups." The League of United Latin American Citizens ("LULAC") filed a notice of appearance and joined the suit as a party-plaintiff. This Court refused to enjoin the use of computers. Ultimately, the referendum petition was certified as sufficient by the city clerk and as claimed by plaintiffs.

On August 1, 2002, the city council held a regular meeting to consider whether to repeal or refer the ordinance for a vote as requested in the petition. Just prior to the beginning of the meeting, the executive vice president for Lumberman's, John Pierret, sent a letter via facsimile to the mayor in which he urged the ordinance be repealed. Mr. Pierret stated he had been advised by the PGA:

[T]hey desire not to proceed with an election on the Cibolo Canyon Conservation and Improvement District No. 1 project. As such, given the development agreement is contingent upon PGA participation, please consider this correspondence our formal request that the city council repeal Ordinance 95579.

Mr. Pierret attached a letter which he had received from the PGA which set forth the commitment of Lumberman's and the PGA to continue to work with the City on the project. The letter states:

[T]he PGA has been supportive of the desire to protect the aquifer as outlined in the development agreement. We had hoped that all parties were moving toward implementing the agreement previously approved by the San Antonio City Council.

Recent actions, however, have caused us to reevaluate the current position of the PGA toward the Cibolo Canyon project. While we remain interested in a future relationship with Lumberman's, we must withdraw our commitment at this time. The PGA does not wish to be involved in an issue that is creating so much controversy and divisiveness within the San Antonio community. If in the future an agreement is reached between Lumberman's and the City of San Antonio regarding the development of the Cibolo Canyon property, we would be interested in revisiting a PGA relationship.

At this August 1, 2002 hearing, representatives of the three groups which had circulated the petitions addressed the city council. COPS and METRO each recognized and joined with Mr. Pierret and the PGA in urging the city council to repeal Ordinance No. 95579 rather than hold the election. Significantly, all three organizations (COPS, METRO and SOA) urged the mayor and council to continue to try to find a way to locate this project in San Antonio. SOA, however, continued to oppose the location of the development over the aquifer. A partial transcript of the August 1st city council meeting provides

testimony from the groups' representatives. Pastor Armando Trujillo of St. Leonard's Catholic Church stated on behalf of COPS and METRO:

I am here representing COPS and METRO to say that we are glad that the city council is repealing the PGA development agreement. I want to underscore that COPS and METRO were never against PGA coming to San Antonio. We are for responsible economic development. Mayor and council, you know very well what are our issues: protecting our water, living wages, and opposing corporate welfare. We would have hoped that you, mayor and council, would have listened to the community and rescinded your vote when the petition was certified. **We recognize PGA officials for providing the leadership and understanding that an election was not in the best interests of San Antonio and asking that you rescind on this issue.**

(Emphasis Added). Mike Phillips of METRO stated:

Let me reemphasize that our focus was not against the PGA. METRO Alliance and COPS focus has always been on the effects on our families and on our most precious public resources of our community. **COPS and METRO recognize the leadership in PGA in understanding that an election was not in the best interests of this community.** Let us put this distraction behind us and refocus the vision of San Antonio. Our families are facing rough times: the layoffs of workers, the difficulties of the flood, the general downturn in the economy. We need to focus on investing in the future of San Antonio. We need to focus on investing in people and education. We need to focus on Kelly USA and on job training. We welcome PGA and all good corporate citizens. San Antonio is alive with hope and opportunity. Mayor, council, we needed you to

respond to the 107,000 signatures we gathered but you haven't until today. Today we need you to respond to the interests and needs of this community and not the needs and interests of greedy developers.

(Emphasis Added). John Thompson of SOA stated:

Mr. Mayor, members of the council, my name is John Thompson and I am here on behalf of Save Our Aquifer campaign Save Our Aquifer was there at the very beginning during negotiations to find a viable site for PGA. We supported the mayor in his attempts to find a site that was not over the aquifer, to find tax incentives that were reasonable and perhaps to include a land swap. Lumberman's refused to consider a land swap. They refused to give up on the amount of their historic and outrageous tax deal.... Now PGA ... has acknowledged that the voters do not support this project on this site with this huge tax forgiveness. **So what now?** .... **The PGA understands that there are options that would allow them to locate in San Antonio still. If they are convinced that San Antonio would make a good location then it would be prudent for them to come back to the table.** They need to take a firm hand with their developer and instruct them to develop a flexibility that the developer was missing. They also need to convince the voters that that deal is fair and respectful. Save Our Aquifer and the voters of San Antonio would like to be included in those talks should they happen with one proviso, not over our water and not with a huge tax break.

(Emphasis added).

Councilman Castro, who voted against the agreement for services in lieu of annexation, opined:

I first want to say that this, as everybody knows, this has been a very long

and delicate process and I do believe those folks who were in opposition truly have wanted all along for the PGA to locate in San Antonio. Some folks just had different reasons for opposing it, either because of the tax subsidy or because of the location of the project. I don't think that there is anybody today cheering the fact that the PGA Village, for right now, it seems will not be coming to San Antonio. At the same time, despite what may well be reported on the 10 o'clock news, this is not what we received today: a letter from the PGA saying that they will not locate in San Antonio. At the end of the letter from Jim Autry, chief executive officer of the Professional Golfers' Association, that we received today, said that if in the future an agreement is reached between Lumberman's and the City of San Antonio regarding the development of the Cibolo Canyon property, we would be interested in revisiting a PGA relationship. In other words, **where we are right now is that PGA and Lumberman's would consider another deal if it is a deal that involves that piece of property. That is something that the groups who have been opposed to it on that site have to make up their minds about whether opposition will consider as absolute against anything on that site. Theoretically, we could for example, consider a non-annexation agreement that would be a defacto tax abatement.**

(Emphasis added). The city council voted to repeal the ordinance.

Thereafter, the mayor and others began a series of meetings with the developers and the groups which had circulated the petitions to bring the parties together. METRO and COPS had opposed the creation of the special taxing district and expressed concern that the jobs to be created would not pay a living wage. The mayor was able to prevail upon Lumberman's to abandon efforts to create the special taxing district, and instead contract for services in lieu of annexation. In addition, Lumberman's agreed to the living wage concept. A new ordinance (No. 96603) was drafted.

At the October 24, 2002 city council meeting, when the non-annexation agreement was considered, representatives of COPS and METRO indicated their satisfaction with the proposal. Pastor Walter D'heedene of Sacred Heart Church representing the COPS organization stated:

> **Mayor and council, the current PGA agreement includes a provision that a living wage be paid to all hotel and PGA resort workers.... That means that the starting wage for all workers will be $10.00. COPS and METRO recognize that this will be a major improvement and a major accomplishment. Mayor Garza, COPS and METRO want to recognize you for your efforts in making sure that this wage provision has been included in the current agreement.** The archbishop, who has been so important in this debate concerning the PGA agreement and the concern for water and for the wages, he has given to me a letter which was presented to you mayor, but he also asked that I read it to you and to the council:

> To Mayor Ed Garza and Council:

> My concerns related to the PGA agreement have always been on protecting the water and paying just wages to the workers. **I want to recognize Mayor Garza and COPS and METRO alliance for working hard on making wages part of this agreement.** It is my understanding that in the year 2007, the hotel and PGA resort will pay a starting wage of $10.00 per hour for all workers. On the issue of the protection of the water, I strongly urge you, mayor

and council, to address and implement the concerns raised by Mr. Jim Blackburn in regards to the protection of the Edwards Aquifer Recharge Zone. Now more than ever, it is important that the City and council listen to the concerns of all citizens in assuring that they will protect the water and I urge all citizens to be vigilant and hold public officials accountable in this regard.
Sincerely in the Lord,
Most Reverend Patrick Flores Archbishop of San Antonio.
Thank you mayor and council.
(Emphasis added).

The representatives of SOA, however, urged the city council to reject the agreement for services in lieu of annexation because it is substantially the same as the ordinance which had been repealed. Renee Saenz stated:

[W]e are here today as representatives of Save Our Aquifer to remind you to do the right thing for San Antonio.... And finally I want to say again that the choice today is simple. What is before the council is the same agreement and therefore the council has the same ethical and legal obligation as before. **The choices are to reject the PGA agreement or to let the citizens of San Antonio vote on this agreement which will have a long lasting impact on the quality of their drinking water.** Thank you.

(Emphasis added). The city council proceeded to pass the new ordinance by a vote of ten to one. Defendants contend this is an example of representative, as opposed to direct, democracy at work, with all sides having input and a compromise being reached.

Plaintiffs SOA and the individual plaintiffs have supplemented their complaint and now filed a motion to enjoin the enforcement of the new ordinance. LULAC made known its intent not to support plaintiffs' challenge to the agreement in lieu of annexation by realigning itself only as an intervenor with reference to the original procedural dispute about the use of computers in verifying petition signatures.

*Elements Plaintiffs Must Establish*

■ A party seeking preliminary injunctive relief must show:

1. A substantial threat that irreparable injury will result if the injunction is not granted;

2. The threatened injury outweighs the threatened harm to the defendant;

3. Granting the injunctive relief will not disserve the public interest; and

4. A substantial likelihood of success on the merits.

*See Rodriguez v. United States,* 66 F.3d 95, 97 (5th Cir.1995); *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.,* 878 F.2d 806, 809 (5th Cir.1989).

If plaintiffs, or any San Antonian whether protected by the Voting Rights Act or not, have a right to vote on the matter at issue, the loss of that sacred right clearly would be irreparable and would outweigh the delay or denial in building a golf course defendants and interested entities would suffer. Moreover, injunctive relief leading to an exercise of town meeting democracy would in and of itself not disserve the public interest. Accordingly, the Court finds elements one, two and three have been met for purposes of this opinion.[4] The Court, therefore, will focus on

4. The Court does not at this time completely reject defendants' contention about the other elements. Defendants argue: (1) plaintiffs have been part of the political process and no

irreparable injury has occurred and none has been demonstrated to occur before a trial on the merits can be held; (2) the threatened injury does not outweigh the damage the in-

728

element four: whether plaintiffs have shown a substantial likelihood of success on the merits.

### The Concept of Federalism and the Limited Role of Unelected Federal Judges in the Local Political Process

The Articles of Confederation did not work because of the diffusion of power among the states. Mr. Washington lamented "the wheels of government are clogged" and turned too slowly, though he could not foresee the pace of a round of golf. While Mr. Jefferson welcomed the lack of central authority, Mr. Hamilton would have been pleased with a strong central monarch. Though unaware of the future development of the American sport of football, Mr. Madison accomplished the placement of the political ball somewhere around the fifty-yard line. This compromise is known as "federalism." *See* THE FOUNDERS' CONSTITUTION Vol. I (Philip B. Kurland & Ralph Lerner eds., University of Chicago Press 1987); *see also* THE FEDERALIST (J.E. Cooke ed., Wesleyan Univ. Press1961); THE DEBATE ON THE CONSTITUTION: FEDERALIST AND ANTIFEDERALIST SPEECHES, ARTICLES, AND LETTERS DURING THE STRUGGLE OVER RATIFICATION Parts I and II (Bernard Bailyn ed., Library of Am.1993). The role of the federal courts is of limited jurisdiction to instances where the elective political process is unrespon-sive to Constitutional and federal statutory dictates and principles. *See* U.S. CONST. art. III, §§ 1, 2 (setting forth circumscribed power of federal courts); *see e.g.*, *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (desegregating public schools); *Heart of Atlanta Motel, Inc. v. United States*, 231 F.Supp. 393 (N.D.Ga.1964) (desegregating public accommodations), *aff'd*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *Harvey v. Morgan*, 272 S.W.2d 621 (Tex.Civ.App.-Austin 1954, writ ref'd n.r.e.) (Court found African American boxer, I.H. "Sporty" Harvey, represented by Maury Maverick, Jr., Carlos Cadena and Harry M. Bellinger of San Antonio, had been discriminated against because of his race and ordered Commissioner of Labor Statistics to desegregate boxing by granting permission to Mr. Harvey to engage in fights with members of the white race); *Sweatt v. Painter*, 210 S.W.2d 442 (Tex.Civ.App.-Austin 1948), *rev'd*, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950) (desegregating law school admissions by reversing lower court ruling which allowed University of Texas to deny enrollment based upon race).

This Court in recent years has been invited to be the *de facto* chief of police for San Antonio[5] and manager of the VIA Metropolitan Transit Authority[6]. Entreaties also came for the Court to supervise local elections in Val Verde County[7], to direct the governance of the Kickapoo Traditional Tribe of Texas[8] and to be the disciplinary superintendent of the Alamo Heights Independent School District[9]. In

junction may cause defendants because, if the Court issues an injunction, the City may be liable for breach of contract damages and future developments may be chilled from entering into contracts with the City; and (3) a preliminary injunction will not serve the public interest because it would interfere with the legislative process and whatever injury can be demonstrated by plaintiffs can be addressed by the Court at a trial on the merits, if necessary.

**5.** *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433 (W.D.Tex.1999).

**6.** *Neff v. VIA Metropolitan Transit Auth.*, 179 F.R.D. 185 (W.D.Tex.1998).

**7.** *Casarez v. Val Verde County*, 957 F.Supp. 847 (W.D.Tex.1997).

**8.** *Garza v. Gonzalez*, No. DR–02–CA–68 (W.D.Tex.2002)

**9.** *Perkins v. Alamo Heights Indep. Sch. Dist.*, 204 F.Supp.2d 991 (W.D.Tex.2002)

each instance, this Court has exercised its limited jurisdiction reluctantly, if at all, so as not to interfere with local issues that should be resolved through democratic processes.

### Whether Plaintiffs Have Shown a Substantial Likelihood of Success on the Merits

■ The spirit of the Voting Rights Act is in response to years of hypocrisy and discrimination against certain Americans who read the words of "all men are created equal" and "representatives shall be ... chosen ... by the people of the several States" (U.S.CONST. art. I, § 2) but were subjected to threats and physical danger if they tried to make those words real and participate at the polls. *See* H.R. 439, 89th Cong.(1st Sess.1965) 1, 11–12, 15–16, 19–20, *reprinted in* 1965 U.S.C.C.A.N. 2437, 2443, 2446–47, 2451–52.

Plaintiffs do not allege defendants engaged in traditional forms of discrimination based on race or ethnic background. Indeed, most of the elected officials, their staff and legal counsel on the defense side of this case are of the same ethnic or racial makeup as plaintiffs. Plaintiffs do allege a custom has evolved in City of San Antonio issues over the years which requires preclearance by the Department of Justice to change the practice or to have a referendum vote on the agreement in lieu of annexation presently in controversy.[10]

Plaintiffs have spoken clearly and loudly of their opposition to continued air-conditioned development and contagious greed over the Edwards Aquifer. Plaintiffs would no doubt prefer a Turneresque game preserve. So would I.[11] The law, however, indicates plaintiffs have not met their burden of substantial likelihood of success on the merits in this federal voting rights case because:

1. Not only are those minorities protected by the Voting Rights Act not eligible to vote on this issue, no one is eligible under state law. Annexation issues are not subject to direct democracy voting through referendum, but rather are reserved to representative democracy, in this instance the San Antonio City Council. *See* Appendix A: Case Law Authorities; *see also Hunter v. City of Pittsburgh,* 207 U.S. 161, 178–79, 28 S.Ct. 40, 52 L.Ed. 151 (1907) (annexation issues are not subject to vote as they are entirely within power of state legislature to regulate); *Barefoot v. City of Wilmington,* 306 F.3d 113, 121–122 (4th Cir.) (annexation concerns may be resolved without opportunity for vote even in face of fierce opposition from citizenry), *cert. denied,* No. 02–390, 2002 WL 31072354, at *1 (Nov. 12, 2002); *City of Hitchcock v. Longmire,* 572 S.W.2d 122, 126–27 (Tex.Civ.App.-Houston [1st Dist.] 1979, writ ref'd n.r.e.) (there is no right existing in people to repeal annexation ordinance through referendum process; power to fix boundary limits was given to Texas municipalities pursuant to state annexation laws).

2. There has been no covered change under the Voting Rights Act. There is no evidence the decision not to annex the Edwards Aquifer property, while annexing other areas, was

---

10. Other referenda include: fluoride 1 (1966), fluoride 2 (1985), spending cap (1986); special tax rollback election (1990), term limits (1991), Applewhite (1991), Applewhite (1994), and fluoride 3 (2000). *See also* Appendix C: Analysis of Previous City of San Antonio Referenda.

11. *See Center for Biological Diversity v. United States Fish & Wildlife Serv.,* 202 F.Supp.2d 594, 596–97 (W.D.Tex.2002) (Biery, J.)

racially motivated. *See* Appendix A: Case Law Authorities; *see also City of Pleasant Grove v. United States,* 479 U.S. 462, 470, 107 S.Ct. 794, 93 L.Ed.2d 866 (1987); *Barefoot,* 306 F.3d at 122; *Mahone v. Addicks Util. Dist.,* 836 F.2d 921, 928 (5th Cir.1988).

3. The agreement in lieu of annexation is not the same ordinance as Ordinance No. 95579, of which plaintiffs and others successfully forced repeal. The most significant difference is the elimination of the special taxing district (*see* defendants's post-hearing memorandum, Exhibit Def–11: redline version which demonstrates differences in the two agreements), perhaps to have been named the "Free State of PGA." [12] Though opposed to Ordinance No. 95579 creating a special tax district, COPS and METRO working through the local political process have accepted the new ordinance and LULAC realigned itself as an intervenor to disengage itself from SOA's challenge to the new agreement.

4. Ordinances involving annexation issues are not subject to referendum petition drives. When the referendum process is viewed in context, the state constitutional and statutory basis for the referendum process provide no authority to the judicial branch to expand the right of referendum. City council decided to exercise its power to repeal the original ordinance as requested by plaintiffs and adopted a new ordinance pursuant to state law annexation powers. *See* Appendix A: Case Law Authorities; Appendix B: Statutory Authorities.

5. Plaintiffs cannot bootstrap themselves into a voting change through argument the City has by default adopted an official policy against the repeal of ordinances which have been the subject of a successful petition drive and in favor of holding referendum elections. The previous referenda were undertaken under distinguishable sets of facts and circumstances and did not involve annexation issues. *See* Appendix C: Analysis of Previous City of San Antonio Referenda.

6. In arguing Subchapter Chapter C of Chapter 43, the annexation plan requirement contained in the Texas Local Government Code, does not apply to areas with few or no residents, SOA is asking a federal court to interpret the intent and construction of a state statute. While Chapter C could have been written more clearly, it does not rise to the level of the federal court substituting its judgment for that of state courts or local officials in the absence of evidence of discrimination against minority voters protected under the Voting Rights Act. *See* Appendix A: Case Law Authorities; Appendix B: Statutory Authorities.

*Conclusion*

Plaintiffs have voiced their concerns for the harmony of nature being interrupted once again by the idolatry of wealth. The Court finds, however, plaintiffs are trying to fit a voting rights square peg into an environmental round hole. Even if plain-

---

**12.** The "Free State of Duval" has already been used. *See* JOHN E. CLARK, THE FALL OF THE DUKE OF DUVAL. A PROSECUTOR'S JOURNAL (1995) (discussing collapse of corrupt south Texas political empire which George Parr and his father before him ruled for more than six decades in Duval County).

tiffs were to obtain the election they seek, golfers may out vote plaintiffs. If plaintiffs won the election, they likely would see development of more density than a golf course.

Barring the coming to San Antonio of an environmental savior or the body politic taxing itself to buy the property in question, development of the land will occur. If that disruption and wounding of the earth is to be minimized and balanced, it will be the people of this region who must demand stewardship and vigilance from their elected and appointed representatives in the legislative branches of government, the Edwards Aquifer Authority, the Texas Commission on Environmental Quality and the United States Fish and Wildlife Service.

The Court makes the following findings and conclusions:

1. This federal court is bound to apply Texas municipal corporation and annexation law unless violative of the United States Constitution or overriding United States statutes.

2. Texas law does not provide for a direct democracy referendum vote on annexation issues; rather those matters are dealt with through representative democracy. Therefore, there is no individual right to vote for any San Antonian in this instance, irrespective of their racial or ethnic protection under the Voting Rights Act.

3. There is no evidence of distortion of minority voting strength by virtue of the ordinance in question.

4. Plaintiffs do not have a substantial likelihood of success of proving a violation of section 5 of the Voting Rights Act on the merits.

This Court declines to break new ground and hold that once 107,000 signatures are collected, the City should be forever denied the ability to legislate on an issue again without first submitting it to the voters for approval. Accordingly, plaintiffs' request for a second temporary restraining order is DENIED.

It is so ORDERED.

### APPENDIX A: CASE LAW AUTHORITIES

* *Lopez v. Monterey County,* 519 U.S. 9, 23, 117 S.Ct. 340, 136 L.Ed.2d 273 (1996) (setting forth factors to be considered when court reviews request for injunction based upon section 5 of Voting Rights Act); *see also City of Lockhart v. United States,* 460 U.S. 125, 129 n. 3, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983); *United States v. Board of Supervisors,* 429 U.S. 642, 645–47, 97 S.Ct. 833, 51 L.Ed.2d 106 (1977);

* *Morse v. Republican Party,* 517 U.S. 186, 213, 116 S.Ct. 1186, 134 L.Ed.2d 347 (1996) ("Congress passed the Voting Rights Act of 1964 because it concluded that case-by-case enforcement of the Fifteenth Amendment, as exemplified by the history of the white primary in Texas, had proved ineffective to stop discriminatory voting practices in certain areas of the country on account of the intransigence of officials who 'resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees.' *South Carolina v. Katzenbach,* 383 U.S. at 335, 86 S.Ct. 803 (citing H.R.Rep. No. 439, at 10–11; S.Rep. No. 162, 89th Cong., 1st Sess., pt. citing H.R.Rep. No. 439, at 10–11; S.Rep. No. 162, 89th Cong., 1st Sess., pt. 3 pp. 8, 12 (1965)).");

* *Presley v. Etowah County Comm'n,* 502 U.S. 491, 510, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992) (preclearance provisions of section 5 of Voting Rights Act

impact only those changes which have "direct relation" to election process itself.);

* *Lucas v. Townsend,* 486 U.S. 1301, 1303, 108 S.Ct. 1763, 100 L.Ed.2d 589 (1988) (noting that in denying request for injunction district court "adverted to the Attorney General's regulation providing that any discretionary setting of the date for a special election, which is defined to include a referendum,. is subject to the preclearance requirement, 28 CFR § 51.17 (1987), and acknowledged that the Attorney General had not precleared the referendum.");

* *City of Pleasant Grove v. United States,* 479 U.S. 462, 470, 107 S.Ct. 794, 93 L.Ed.2d 866 (1987) ("Even if [the City's] decision not to annex [the subject property] was racially motivated, that decision was not a change respecting voting and hence not subject to § 5 [of the Voting Rights Act]"; nonetheless, the failure to annex minority areas, while the city was simultaneously annexing non-minority areas, can be "highly significant" in demonstrating that a city's annexation plan was purposefully designed to perpetrate a certain area "as an enlarged enclave of white voters.");

* *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 731, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) ("We are loathe to reject such a common practice when conducting the limited judicial review accorded economic legislation under the Fifth Amendment's Due Process Clause.");

* *City of Lockhart v. United States,* 460 U.S. 125, 129 n. 3, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983) (in considering claim brought under section 5of Voting Rights Act, court should consider whether there was "covered change,"

whether covered change was precleared, and any appropriate remedy);

* *City of Eastlake v. Forest City Enters., Inc.,* 426 U.S. 668, 672, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976) ("Under our constitutional assumptions, all power derives from the people, who can delegate it to representative instruments which they create." *See e.g.,* The Federalist No. 39 (v.Madison).");

* *Perkins v. Matthews,* 400 U.S. 379, 394–95, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971) (A change in practice regarding voting appears to be a "covered change" even though statutory law authorized the new practice before the Voting Rights Act baseline date: "Congress expressly indicated its intention that the State and subdivisions, rather than citizens seeking to exercise their rights, bear the burden of delays.")

* *Allen v. State Bd. of Elections,* 393 U.S. 544, 569, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) (decision to make position of county officer appointive instead of elective was "covered change" because it impacted offices for which electors would be able to vote);

* *South Carolina v. Katzenbach,* 383 U.S. 301, 328, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (The Voting Rights Act was designed to "shift the advantage of time and inertia from the perpetrators of the evil to its victims.");

* *Hunter v. City of Pittsburgh,* 207 U.S. 161, 178–79, 28 S.Ct. 40, 52 L.Ed. 151 (1907) (There is no substantive constitutional right to vote on annexation issues; such matters are entirely within the power of the state legislature to regulate.);

* *Barefoot v. City of Wilmington,* 306 F.3d 113, 121–22 (4th Cir.) (Annex-

ation concerns may be resolved "without any opportunity for a vote, even in the face of fierce opposition from the citizenry; the matter is within 'the absolute discretion of the State.' *Hunter,* [207 U.S.] at 178, 28 S.Ct. 40."), *cert. denied,* —— U.S. ——, 123 S.Ct. 538, —— L.Ed.2d —— (2002);

* *Barefoot,* 306 F.3d at 122 ("But [the *Hayward*] limitation on the state's discretion has not changed the consistent understanding that '[t]here is no basis for an equal protection claim when no one is granted the right to vote on the matter of annexation.' *Berry [v. Bourne],* 588 F.2d [422], 424 [(4th Cir.1978)]. It is only when the right to vote on a proposed annexation has been granted that 'the equal protection clause requires that ... restrictions on the franchise on grounds other than age, citizenship, and residence can be tolerated only upon proof that it furthers a compelling state interest.' *Hayward v. Clay,* 573 F.2d [187], 190 [(4th Cir.1978), *cert. denied,* 439 U.S. 959, 99 S.Ct. 363, 58 L.Ed.2d 351 (1978)]; *see also Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 [(1966)] ('[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.'). In this case, no one has been given the right to vote on the annexation proposed by the City of Wilmington.");

* *Associated Gen. Contractors v. City of Columbus,* 172 F.3d 411, 417 (6th Cir. 1999) ("Even under the most expansive reading of the limited circumstances in which the federal courts have been held to have jurisdiction to interfere in the legislative process, however, the district court did not have such power here.");

* *Rodriguez v. United States,* 66 F.3d 95, 97 (5th Cir.1995) (setting forth elements party seeking preliminary injunctive relief must establish);

* *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.,* 878 F.2d 806, 809 (5th Cir.1989) (setting forth factors plaintiff must demonstrate in order to obtain preliminary injunctive relief);

* *Mahone v. Addicks Util. Dist.,* 836 F.2d 921, 928 (5th Cir.1988) ("In his complaint, Mahone does not suggest that the District was motivated by either racial or political [gerrymandering] concerns when it decided not to annex Mahone's tract of land. In fact, Mahone does not couch his voting rights claim in terms of gerrymandering or equal protection analysis at all. Instead, he simply argues that because he was excluded from the district, he has no right to vote.... [H]owever, unless one of the recognized exceptions applies, the Constitution does not forbid a water district or other municipality from excluding land even if the effect of the exclusion is to divest the excluded landowner of his right to vote in district elections.");

* *Cate v. Oldham,* 707 F.2d 1176, 1189 (11th Cir.1983) (injury is irreparable "if it cannot be undone through monetary remedies");

* *Duke v. University of Tex.,* 663 F.2d 522, 526 (5th Cir.1981) ("Drawing an inference of an intent to exclude a particular result from the failure to expressly proscribe that result is the essence of the common law maxim *'expressio unius est exclusio alterius,'* often applied as an aid in statutory construction. The maxim embodies a sensible insight into the customary manner in which language is used to communicate ideas. Simply stated,

'[i]t expresses the learning of common experience that generally when people say one thing they do not mean something else.' " (citations omitted));

* *Florida Med. Ass'n, Inc. v. United States,* 601 F.2d 199, 202 (5th Cir. 1979) ("A preliminary injunction, however, must be the product of reasoned application of the four factors held to be necessary prerequisites before a preliminary injunction may be obtained.");

* *Hayward v. Clay,* 573 F.2d 187, 190 (4th Cir.1978), *cert. denied,* 439 U.S. 959, 99 S.Ct. 363, 58 L.Ed.2d 351 (1978) (recognizing Supreme Court has subjected annexation questions to some scrutiny under Fourteenth Amendment: where exercise of state's discretion in ordering its political subdivisions involves creation of suspect classifications or infringes on fundamental rights, state action will be upheld only if it furthers compelling state interest);

* *Siff v. State Democratic Executive Comm.,* 500 F.2d 1307, 1309 (5th Cir. 1974) ("sliding scale" must be applied when determining probability of plaintiffs' success on merits and plaintiffs' irreparable injury in absence of interlocutory relief);

* *Canal Auth. v. Callaway,* 489 F.2d 567, 573 (5th Cir.1974) ("[O]nly those injuries that cannot be redressed by the application of a judicial remedy after [a] hearing on [the] merits can properly justify a preliminary injunction.");

* *United States v. Louisiana,* 952 F.Supp. 1151, 1159–60 (W.D.La.) (four part test for preliminary injunction does not apply in government action to enforce action brought under section 5 of Voting Rights Act), *aff'd,* 521 U.S. 1101, 117 S.Ct. 2476, 138 L.Ed.2d 986 (1997);

* *Muhammad Temple of Islam–Shreveport v. City of Shreveport,* 387 F.Supp. 1129, 1134 (W.D.La.1974) ("As the Court has been cited no conflicting legislation by Congress, and feeling that the ordinance is a valid exercise of the municipality's police power, this Court is loathe to strike this ordinance with the brand of unconstitutionality.");

* *Hammonds v. City of Corpus Christi,* 226 F.Supp. 456, 458–59 (S.D.Tex. 1964) ("Although we may disagree with the mode of annexation or annexations themselves, the remedy of those aggrieved is not in the courts, but in the State Legislature."), *aff'd,* 343 F.2d 162 (5th Cir.), *cert. denied,* 382 U.S. 837, 86 S.Ct. 85, 15 L.Ed.2d 80 (1965); *see also Superior Oil Co. v. City of Port Arthur,* 628 S.W.2d 94, 96 (Tex.App.-Beaumont 1981, writ ref'd n.r.e.) (discussing state cases holding same);

* *Owens Corning v. Carter,* 997 S.W.2d 560, 580 (Tex.) (recognizing legislative history can include House Research Organization bill analysis), *cert. denied,* 528 U.S. 1005, 120 S.Ct. 500, 145 L.Ed.2d 386 (1999);

* *Bolton v. Sparks,* 362 S.W.2d 946, 950 (Tex.1962) (finding zoning ordinances and amendments to such ordinances are invalid where mandatory provisions of statutes concerning notice and hearing have been ignored; requirement of notice and hearing are intended for protection of property owners against arbitrary action and compliance with mandatory provisions of statutes is essential to exercise of jurisdiction by municipal governing bodies);

* *Glass v. Smith,* 150 Tex. 632, 639, 244 S.W.2d 645, 650 (1951) (setting forth standard for use when determining

whether city officials should be compelled to take action on referendum petition: "Has the subject matter of the proposed ordinance been withdrawn, expressly or by necessary implication, by either the general law or the city charter, from the filed in which the initiatory process is operative?");

\* *Humphrey v. Balli,* 61 S.W.3d 519, 521–25 (Tex.App.-San Antonio 2001, no pet.) (citizens of Seguin could use power of referendum to either repeal ordinance or force vote on ordinance which authorized the sale of city owned land; Court deferred to standard set forth in *Glass v. Smith,* 150 Tex. at 639, 244 S.W.2d at 650, to determine mandamus should issue to force city to repeal statute or hold referendum vote);

\* *City of Houston v. Todd,* 41 S.W.3d 289, 297–98 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (Court must, among other rules of statutory construction, "consider the entire statute, not simply the disputed portions" and "each provision must be construed in the context of the entire statute of which it is a part" so as not to "render a law or provision absurd or meaningless.");

\* *City of Stephenville v. Walker,* 841 S.W.2d 566, 569 (Tex.App.-Eastland 1992, writ denied) (legislative history can include, among other things, earlier versions of bill);

\* *Vara v. City of Houston,* 583 S.W.2d 935, 937–39 (Tex.Civ.App.-Houston [1st Dist.] 1979, writ ref'd n.r.e.) (citizens of Houston could not use power of referendum to disannex territory; Court deferred to standard set forth in *Glass v. Smith,* 150 Tex. at 639, 244 S.W.2d at 650, to determine mandamus should not issue to compel city to take action on petition);

\* *City of Hitchcock v. Longmire,* 572 S.W.2d 122, 126–27 (Tex.Civ.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.) (As the power to fix boundary limits of the City and to provide for extension of these boundary lines was given to Texas municipalities pursuant to state annexation laws, there is not a right or power existing in the people to repeal an annexation ordinance through the referendum process; moreover, "[t]he provisions of the general law requiring notice and hearing cannot be complied with if the ordinance is submitted to an election. For a hearing to be meaningful, it necessarily must be held before the body authorized to act in the manner.");

\* *San Pedro North, Ltd. v. City of San Antonio,* 562 S.W.2d 260, 261–62 (Tex. Civ.App.-San Antonio, writ ref'd n.r.e.) (Opponents of a zoning ordinance submitted a sufficient number of signatures on a petition seeking the repeal of a zoning ordinance; the City held an election and the vote was in favor of a repeal; in a suit by the landowner challenging a repeal, the Court found, although the charter contained no language excluding zoning ordinances from its provisions, the zoning ordinance was not subject to a referendum because the city charter "grants to the council the power to regulate the zoning and use of land" and as "there are no constitutional or statutory provisions relating to initiative and referendum, except for isolated statutory provisions for referendum with respect to certain subjects not here relevant," and the hearing and notice provisions of the ordinance having been met, the zoning ordinance could not be repealed by referendum.), *cert. denied,* 439 U.S. 1004, 99 S.Ct. 616, 58 L.Ed.2d 680 (1978).

* *Hancock v. Rouse,* 437 S.W.2d 1, 4 (Tex.Civ.App.-Houston [1st Dist.] 1969, writ ref'd n.r.e.) (significance of required public hearings before adoption of annexation related ordinance may stem from Texas court decisions which restrict power of initiative and referendum);

* *Pitzer v. City of Abilene,* 323 S.W.2d 623, 626 (Tex.Civ.App.-Eastland 1959, no writ) (non-annexation agreement is valid and binding contract on city);

* *See also:* Op. Tex. Att'y Gen. No. JC–0507 (2002) ("A federal court decision interpreting Texas law is not binding on Texas courts.") (citing *Longview Bank & Trust v. First Nat'l Bank,* 750 S.W.2d 297, 300 (Tex.App.-Fort Worth 1988, no writ); *Woodard v. Tex. Dept. of Human Res.,* 573 S.W.2d 596, 598 (Tex.Civ.App.-Amarillo 1978, writ ref'd n.r.e.)); *see also* Tex. Att'y Gen No. DM–426 (1996).

### APPENDIX B: STATUTORY AUTHORITIES

Under the charter of the City of San Antonio, ordinances can be passed or repealed either by the city council or by the voters using the process of initiative and referendum. Article IV, section 35, states:

Section 35. POWER OF REFERENDUM. The electors shall have power to approve or reject at the polls any ordinance passed by the Council save one appropriating money, levying taxes, or fixing public utility rates, or any ordinance submitted by the Council of its own initiative to a vote of the electors.... [O]rdinances zoning or rezoning property shall not be subject to this power.

Section 35 further provides:

Within forty days after the enactment by the Council of any ordinance which is subject to a referendum, a petition signed by qualified electors of the City equal in number to at least ten percent of the electors qualified to vote at the last preceding regular municipal election may be filed with the City Clerk requesting that any such ordinance be either repealed or submitted to a vote of the electors....

If the petition has enough qualified signatures, it is certified and the ordinance does not go into effect "until and unless approved by the voters." Section 39 of article IV states:

Section 39. EFFECT OF CERTIFICATION ON REFERENDUM PETITION. When a referendum petition or amended petition has been certified as sufficient, the ordinance specified in the petition shall not go into effect, or further action thereunder shall be suspended if it be in effect, until and unless approved by the electors.

Rather, the city council is required to have a vote on whether to repeal the ordinance (presumably to avoid the cost of the election) within thirty days. If the ordinance is not repealed, then the referendum election is required to be held within ninety days. As set forth in article IV, sections 40 and 41:

Section 40. CONSIDERATION BY COUNCIL. Whenever the Council receives a petition from the City Clerk, it shall be immediately considered. A proposed initiative ordinance shall be read and provision shall be made for a public hearing. The Council shall take final action on the ordinance not later than sixty days after the date on which such ordinance was submitted to the Council by the City Clerk. A referred ordinance shall be reconsidered and the Council shall, within thirty days, vote upon the question, "Shall the ordinance be repealed?"

Section 41. SUBMISSION TO ELECTORS. If the Council shall fail to pass an ordinance proposed by initiative

petition, or shall pass it in a form different from that set forth in the petition therefor, or if the Council shall fail to repeal a referred ordinance, the proposed or referred ordinance shall be submitted to the electors at a special or regular municipal election not less than thirty nor more than ninety days from the date the Council takes its final vote thereon.

Under the Texas Local Government Code, however, voter approval of annexation by a municipality is required only if "under its charter, the governing body of a home-rule municipality initiates or orders an election to submit to the qualified voters of the municipality the question of annexing an adjacent area." Tex. Loc. Gov't Code Ann. § 43.022 (Vernon 1999). Alternatively, state annexation laws require the governing body of a city to conduct two public hearings before initiation of annexation. *Id.* § 43.0561 (Vernon Supp.2003). After those hearings are held, "the municipality and the property owners of the area proposed for annexation shall negotiate for the provision of services to the area after annexation or for the provision of services to the area in lieu of annexation under section 43.0563." *Id.* § 43.0562 (Vernon Supp.2003). Section 43.0563, governing contracts for the provision of services in lieu of annexation, provides in relevant part:

The governing body of a municipality with a population of less than 1.6 million may negotiate and enter into a written agreement with representatives designed under Section 43.0562(b) for the provision of services and the funding of the services in the area. The agreement may also include an agreement related to permissible land uses and compliance with municipal ordinances.

*Id.* § 43.0563 (Vernon Supp.2003).

Subchapter C of Chapter 43 of the Local Government Code further provides:

This section does not apply to an area proposed for annexation if: (1) the area contains fewer than 100 separate tracts of land on which one or more residential dwellings are located on each tract . . . .

Tex. Loc. Gov't Code Ann. § 43.052(h)(1) (Vernon Supp.2003). Section 43.0563 is a part of Subchapter C regarding "Annexation Procedure for Areas Annexed Under Municipal Annexation Plan." *Id.* Subchapter C–1, regarding Annexation Procedure for Areas Exempted from Municipal Annexation Plan, states: "Sections 43.051, 43.054, 43.055, 43.0565, 43.0567, and 43.057 apply to the annexation of an area to which this subchapter applies." *Id.* § 43.062(a).

### APPENDIX C: ANALYSIS OF PREVIOUS CITY OF SAN ANTONIO REFERENDA

The instances of previous San Antonio referenda, none of which involve an annexation ordinance, are:

1. Spending Cap (1986)
2. Term Limits (1991)
3. Special Tax Rollback Election (1990)
4. Fluoride 1 (1966)
5. Applewhite (1991)
6. Fluoride 2 (1985)
7. Applewhite (1994)
8. Fluoride 3 (2000)

Of the six instances, two, the spending cap (1986) and term limits (1991), were "Charter Revision" elections pursuant to section 9.004 of the Local Government Code which sets up a mandatory election if petitions are certified. Section 9.004 provides:

The governing body of a municipality on its own motion may submit a proposed charter amendment to the municipality's qualified voters for their approval at an election. **The governing body shall submit a proposed charter amendment**

**to the voters for their approval at an election if the submission is supported by a petition signed by a number of qualified voters of the municipality equal to at least five percent of the number of qualified voters of the municipality or 20,000, whichever number is smaller.**

(Emphasis added). TEX.LOC. GOV'T CODE ANN. § 9.004 (Vernon 1999). The special tax rollback election also appears to indicate no alternative other than to submit the issue to a vote of the people which cannot be corrected by a "voluntary rollback." *See* TEX. TAX CODE ANN. § 26.01 (Vernon 2002). It is true the fluoride election of 1966 was voted on rather than repealed. However, it predates the effective date of the Voting Rights Act, November of 1972.

The city council did not repeal and submitted to a vote of the people the fluoride election in 1985 and the first Applewhite election in 1991. Applewhite had been in effect for more than three years and the City may have been exposed to increased liability had it voluntarily abandoned contracts and other agreements which had already gone into effect. Fluoride had, in 1985, already been to a vote once and council chose to let it go to election again upon petition by the citizens.

In Applewhite 2000, city council noted that the council had pledged to the people that if it brought up the Applewhite issue again, it would be submitted to a vote of the people. The ordinance relating to Applewhite 1994 contains this representation:

*Whereas,* by a vote in May 1991, the voters of San Antonio abandoned the Applewhite project as it was then planned ..... And

*Whereas,* after that vote, the City pledged that future use and development of the Applewhite site would be subject to voter approval .... And

*Whereas,* Section 35 of the City Charter provides that the City Council, on its own initiative, may submit any ordinance to the electors to be approved or rejected ....

The fluoride 3 (2000) ordinance provides:

All Community Water Systems .... which are direct suppliers of water through piping systems serving the City of San Antonio are hereby authorized and directed to fluoridate all water supplies within their distribution systems to reach a total fluoride concentration of parts per million as recommended by the Texas Department of Health.

The city council found:

Because it is the desire and intent of the City Council that the decision of the Voters determine whether or not to fluoridate the water supplies, this issue will be placed before the qualified electors of the City ....

In the case of fluoride, the city was arguably faced with a unique jurisdictional problem. The San Antonio Water System ("SAWS") provides service to only a part of San Antonio. Other water systems, including the Bexar Metropolitan Water District, serve much of the south and west sides of the City. The city council might well have had power to force SAWS to fluoridate, but arguably had much less influence and almost no power over Bexar Metropolitan Water District. By submitting the issue to a vote, *the different providers were made aware of the will of the people thereby eliminating potential jurisdictional debate.*